**McINTOSH COUNTY BANK,
et al., Appellants,**

v.

**DORSEY & WHITNEY,
LLP, Respondent.**

No. A06–486.

Court of Appeals of Minnesota.

Jan. 10, 2007.

---

Thomas C. Atmore, Edward W. Gale, Leonard, O'Brien, Spencer, Gale & Sayre, Ltd., Minneapolis, MN, for appellants.

Richard G. Mark, Mark G. Schroeder, Jason R. Asmus, Briggs and Morgan, P.A., Minneapolis, MN, for respondent.

Considered and decided by WILLIS, Presiding Judge; WRIGHT, Judge; and HUSPENI, Judge.*

## O P I N I O N

WILLIS, Judge:

Appellants challenge the district court's grant of summary judgment to respondent on appellants' legal-malpractice, breach-of-contract, and negligent-misrepresentation claims. We conclude that the district court appropriately granted summary judgment to respondent on appellants' negligent-misrepresentation claim. The district court also correctly found that there are no genuine issues of material fact as to whether appellants have standing to sue respondent for legal malpractice under a contract-assignment or a tort theory. But because genuine issues of material fact exist as to whether appellants were third-party beneficiaries of respondent's legal services and whether appellants had an implied contract for legal

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to

Minn. Const. art. VI, § 10.

services with respondent, we conclude that the district court erred when it granted summary judgment on appellants' legal-malpractice and breach-of-contract claims. We affirm in part, reverse in part, and remand.

## FACTS

Appellants are 31 banks from the Midwest that participated in two loans, originated by Miller & Schroeder Financial, Inc. (Miller), to President R.C.-St. Regis Management Company (President). Under a "management agreement," President agreed to construct and manage a casino on the St. Regis Mohawk Tribe's reservation in New York, and the tribe agreed to repay President when the casino's revenues exceeded its expenses. The management agreement required approval from the National Indian Gaming Commission (NIGC), and such approval was obtained.

Miller arranged to make two loans to President to finance the casino project. As was Miller's business practice, it sought commitments from participating banks to purchase interests in the loans. Miller retained Dorsey & Whitney LLP (Dorsey), as it had done for past loan transactions, to draft loan documents, including a "pledge agreement," under which the tribe recognized its obligation to repay President, recognized President's pledge to Miller of all payments received from the tribe, and agreed to make the payments it owed to President under the management agreement to an escrow account for Miller. President submitted an amendment to the management agreement to the NIGC for review and approval, and Dorsey submitted loan documents, including the pledge agreement, for the NIGC's review and approval. Although there is no dispute that the amendment to the management agreement required NIGC approval, Dorsey advised Miller that the pledge agreement did not require NIGC approval, so Miller decided to close the loan without waiting for NIGC approval of the pledge agreement. Miller sent a letter to appellants and other prospective participating banks to advise them that the NIGC had not approved the amendment to the management agreement or reviewed the pledge agreement but that, because the review would take up to 60 days, which could be later than the scheduled casino opening, Miller wished to move forward and close the loan without waiting for NIGC approval.

The loans were closed, and Miller sold the loan balances to 32 banks, including appellants. Appellants signed "participation agreements," which were prepared internally by Miller, and which assigned to each appellant an interest in the loans, collateral, and collections; the agreements also required appellants to acknowledge that they had made a "complete examination of copies of all Loan Documents" and "approve[d] of the form and content of the same"; that they had received all of the information that they needed to "make an independent and informed judgment with respect to the Collateral, Borrower and Obligor and their credit and the desirability of purchasing an undivided interest in the Loan"; and that they accepted the "full risk of nonpayment" by President. The participation agreements also required appellants to acknowledge that Miller had made no warranty or representation regarding the enforceability of any loan documents and to waive their rights to sue Miller for any negligence by its attorneys or others, provided that Miller used "reasonable care in the selection" of counsel.

The casino opened in April 1999 but was financially unsuccessful, and President began to default on the loans shortly thereafter. In October 2000, representatives of Miller, Dorsey, several appellants, and the

tribe met in New York. The tribe expressed its belief that it was not obligated to make payments under the pledge agreement because the agreement had not been approved by the NIGC and was therefore unenforceable. Subsequently, appellants sued the tribe in New York for breach of the pledge agreement, and the tribe responded with a qui tam action in federal court in New York. Appellants and the tribe ultimately reached a settlement agreement.

Miller filed for bankruptcy in January 2002, and appellants commenced an adversary proceeding against Dorsey in federal bankruptcy court, alleging that Dorsey was negligent when it advised Miller, and therefore appellants, that the pledge agreement did not require NIGC approval. The bankruptcy court dismissed all but three appellants because they had not filed proofs of claim against Miller's estate, and it denied Dorsey's motion for summary judgment as to the remaining three appellants.

In February 2005, Bremer Business Finance Corporation (Bremer), which had not participated with appellants in the adversary proceeding, commenced a separate action in federal bankruptcy court against Dorsey. In the same month, appellants filed suit against Dorsey in state district court, alleging the same claims that they had raised in the federal bankruptcy court. In May 2005, the bankruptcy court abstained from consideration of the claims of the three appellants remaining in bankruptcy court. *See* 28 U.S.C. § 1334(c)(1) (2000) (allowing a federal district court to abstain from hearing a bankruptcy proceeding "in the interest of justice, or in the interest of comity with State courts or respect for State law"). But the bankruptcy court declined to dismiss or abstain from consideration of Bremer's claims, while acknowledging that its failure to abstain could result in a case being tried in state court on the "same set of facts" as the case that would be tried in bankruptcy court. Dorsey moved for summary judgment in state district court in the action brought by appellants, and the court granted the motion. This appeal follows.

## ISSUES

I. Was summary judgment appropriately granted to Dorsey on appellants' legal-malpractice claim based on third-party beneficiary, implied-contract, contract-assignment, and tort theories?

II. Was summary judgment appropriately granted to Dorsey on appellants' breach-of-contract claim?

III. Was summary judgment appropriately granted to Dorsey on appellants' negligent-misrepresentation claim?

## ANALYSIS

"A motion for summary judgment shall be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that either party is entitled to a judgment as a matter of law. On appeal, the reviewing court must view the evidence in the light most favorable to the party against whom judgment was granted." *Fabio v. Bellomo,* 504 N.W.2d 758, 761 (Minn.1993) (citation omitted). This court asks two questions when reviewing a district court's decision to grant summary judgment: (1) whether there are any genuine issues of material fact and (2) whether the district court erred in its application of the law. *State by Cooper v. French,* 460 N.W.2d 2, 4 (Minn.1990). No genuine issue of material fact exists when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *DLH, Inc. v. Russ,* 566 N.W.2d 60, 69 (Minn.

1997) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). "[T]he party resisting summary judgment must do more than rest on mere averments." *Id.* at 71. A genuine issue for trial must be established by sufficient evidence. *Id.* at 69–70.

## I. Legal Malpractice

 To succeed on a legal-malpractice claim, a plaintiff must establish four elements: "(1) the existence of an attorney-client relationship; (2) acts constituting negligence or breach of contract; (3) that such acts were the proximate cause of the plaintiff's damages"; and (4) that "but for defendant's conduct, the plaintiff would have obtained a more favorable result in the underlying transaction than the result" that occurred. *Jerry's Enters. v. Larkin, Hoffman, Daly & Lindgren, Ltd.*, 711 N.W.2d 811, 816, 819 (Minn.2006). If the plaintiff fails to prove even one of these elements, the claim fails. *Id.* at 816. Because the district court concluded that there were no genuine issues of material fact bearing on its determination that appellants had no attorney-client relationship with Dorsey, it declined to reach the remaining elements of appellants' claims.

 Generally, an attorney is liable only to those with whom he has an attorney-client relationship. *Marker v. Greenberg*, 313 N.W.2d 4, 5 (Minn.1981). But Minnesota courts have recognized exceptions to this strict privity requirement under a third-party-beneficiary theory, under an implied-contract theory, and under a tort theory of representation. *Admiral Merchs. Motor Freight, Inc. v. O'Connor & Hannan*, 494 N.W.2d 261, 265 (Minn. 1992). Whether an attorney-client relationship exists is usually a question of fact that depends on the communications and circumstances. *Id.* Appellants argue that all three exceptions to the strict privity requirement apply here.

### *Third–Party–Beneficiary Theory*

Appellants argue that they had an attorney-client relationship with Dorsey—and thus have standing to sue Dorsey for legal malpractice—because they were third-party beneficiaries of Dorsey's representation of Miller.[1] The district court concluded that there was no genuine issue regarding the fact that "[a]ny intended benefit to [appellants] of the attorney-client relationship between Miller & Schroeder and Dorsey was incidental; [appellants] were not the sole intended beneficiaries or the intended direct beneficiaries, as required by *Marker*." Because the district court determined that appellants were not "sole intended beneficiaries" or "intended direct beneficiaries," which it viewed as a threshold question, it declined to apply the multifactor analysis first described in *Lucas v. Hamm*, 56 Cal.2d 583, 15 Cal.Rptr. 821, 364 P.2d 685 (1961), known as the *Lucas* factors. The *Lucas* factors consider:

> (1) the extent to which the transaction was intended to affect the nonclient; (2) the foreseeability of harm to the nonclient; (3) the degree of certainty that the nonclient suffered injury; (4) the closeness of the connection between the attorney's conduct and the injury; (5) the policy of preventing future harm; and (6) whether recognition of liability under the circumstances would impose an undue burden on the profession.

*Goldberger v. Kaplan, Strangis & Kaplan, P.A.*, 534 N.W.2d 734, 738 (Minn.App.1995)

---

1. The parties use the terms "third-party beneficiary," "sole beneficiary," and "intended beneficiary" interchangeably, and so have courts. We use only "third-party beneficiary" for the sake of consistency.

(citing *Lucas*, 364 P.2d at 687–88), *review denied* (Minn. Sept. 28, 1995).

Appellants argue that the district court misapplied Minnesota law when it stated that, as a threshold requirement, appellants needed to be "intended" beneficiaries of Dorsey's representation, and the "sole purpose" of Miller's retention of Dorsey had to be to benefit appellants. Appellants assert that the district court was required to apply the *Lucas* factors to determine whether "one of the primary objectives" of the agreement between Dorsey and Miller was to benefit appellants.

■ Dorsey emphasizes that the third-party-beneficiary exception to the privity requirement for a legal-malpractice claim is very limited. Dorsey argues that the "sole purpose" test remains the law in Minnesota and that the "primary purpose" test that appellants advocate has never been adopted or applied in Minnesota. Dorsey contends that the district court did not misapply the law and that the undisputed facts demonstrate that benefiting appellants was not the sole purpose of Miller's retention of Dorsey. We agree that appellants were not the "sole beneficiaries" of Dorsey's representation because it was also in Miller's interest for the loan documents to be enforceable. But although the "sole purpose" language appears in our caselaw, we disagree that Minnesota courts have required the benefit to a third party to be truly the sole purpose of the legal representation in order for the third party to have standing to bring a legal-malpractice claim.

The original source of the "sole purpose" language in Minnesota is *Marker*, 313 N.W.2d at 5. In *Marker*, a father retained an attorney to draft his will and, later, to draft deeds that conveyed real estate to the father and his son as joint tenants. *Id.* at 4. The father died, and the son claimed that the fact that the real estate was held in joint tenancy rather than tenancy in common caused the entire value of the real estate to be included for tax purposes in the father's gross estate. *Id.* The son sued the attorney for legal malpractice. *Id.* at 4–5. The *Marker* court determined that the son had no standing to bring a legal-malpractice claim against the attorney because the son received the intended benefit of the deeds: joint ownership of the property. *Id.* at 5–6. Notably, the court did not base its decision on—and in fact did not even mention—the fact that the benefit to the son could not have been the sole purpose of the legal representation because, at most, the father intended for his son to derive a benefit equal to his own when he conveyed one-half of the interest in the property to his son and retained the other half. Since *Marker*, Minnesota courts have included the "sole purpose" language when setting forth the components of a third-party beneficiary analysis but have not strictly applied it as a requirement for the third party to have standing to bring a legal-malpractice claim. *See; e.g., Admiral Merchs.*, 494 N.W.2d at 266 (citing *Marker* to note that an attorney may be liable to a third-party beneficiary "when the client's *sole purpose* is to benefit the third party directly," but proceeding to reverse summary judgment based on its application of the *Lucas* factors, including *"the extent to which* the transaction was intended to affect" the nonclient) (emphasis added). Therefore, the fact that the benefit to appellants was not the "sole purpose" of Dorsey's representation of Miller is not fatal to appellants' claim that they were third-party beneficiaries of Dorsey's representation.

Appellants assert that the district court should have applied the *Lucas* factors, without resolving any threshold issue, to determine whether "one of the primary objectives" of the agreement between Dor-

sey and Miller was to benefit appellants. Dorsey argues that the district court correctly determined that whether appellants were direct and intended third-party beneficiaries is a threshold question and that, because the undisputed material facts demonstrated that appellants were not, the district court correctly declined to apply the *Lucas* factors. Dorsey argues that the *Lucas* factors determine the "extent of an attorney's duty to a non-client," not whether the nonclient is a direct and intended third-party beneficiary in the first place.

We note that Minnesota courts have been inconsistent in defining the proper role of the *Lucas* factors. At least one court has viewed the intended-beneficiary requirement as a threshold question before applying the *Lucas* factors and used the factors to determine the extent of the duty, as Dorsey advocates. *Francis v. Piper*, 597 N.W.2d 922, 924 (Minn.App. 1999). But in *Goldberger*, for example, this court applied the factors to determine whether the attorney owed a duty to the nonclient at all. 534 N.W.2d at 738 (noting that "the supreme court intended the *Lucas* factors as an aid in determining whether the nonclient is a third-party beneficiary"). Clarification is necessary.

In *Lucas* itself, the California Supreme Court observed the relaxation of the strict privity requirement for claims involving negligence in the performance of a contract and noted that under then-recent caselaw,

> the determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors[.] ... The same general principle must be applied in determining *whether a beneficiary is entitled to bring an action* for negligence in the drafting of a will. ...

364 P.2d at 687–88 (emphasis added). The *Lucas* court applied the "various factors" to determine whether a nonclient beneficiary of legal representation is entitled to bring an action for legal malpractice without first resolving any threshold issue. *Id.* at 687.

 We conclude that the district court erred in its application of the law when, after concluding that there were no genuine issues of material fact, it declined to apply the *Lucas* factors to determine, as a matter of law, whether appellants were third-party beneficiaries of Dorsey's representation of Miller and thus had a basis on which to sue Dorsey for legal malpractice. Not dissimilar from a determination of the existence of a contract, if the material facts are not in dispute, a district court determines as a matter of law whether the plaintiff was a third-party beneficiary by applying the *Lucas* factors. *See Estate of Peterson*, 579 N.W.2d 488, 490 (Minn.App. 1998) (stating that when there are no relevant facts in dispute, the existence of a contract is "solely a question of law to be determined by the court"), *review denied* (Minn. Aug. 18, 1998). But when, as here, there are genuine issues of material fact, application of the *Lucas* factors to determine whether the plaintiff was a third-party beneficiary of legal representation must be left to the fact-finder to the extent that the facts necessary for application of the *Lucas* factors are in dispute. *See Admiral Merchs.*, 494 N.W.2d at 266 (reversing a grant of summary judgment on a legal-malpractice claim in part because there were genuine issues of material fact and because "the question of whether an attorney-client relationship existed" under a third-party beneficiary theory "should be determined by the fact finder").

 Here, there is conflicting evidence regarding, for example, the extent to which Dorsey's representation was intend-

ed to affect appellants as well as the foreseeability to Dorsey of harm to appellants. *See Goldberger,* 534 N.W.2d at 738 (listing the *Lucas* factors). Therefore, the district court erred when it granted summary judgment on appellants' legal-malpractice claim. Even if we were to agree with the district court's determination that there are no genuine issues of material fact, the district court then erred by not applying the *Lucas* factors to determine whether appellants were third-party beneficiaries of Dorsey's representation of Miller. But because we conclude that there are genuine issues of material fact that must be resolved in order to apply the *Lucas* factors, those issues must be resolved by the factfinder on remand.

### Implied–Contract Theory

■ Appellants argue that they had an implied contract for legal services with Dorsey and therefore have standing to sue Dorsey for legal malpractice. Appellants base their implied-contract theory on their assertions that Dorsey knew that Miller sold participation in its loans and that Dorsey knew that the advice Miller sought was "on behalf of the participants," so "Dorsey's role as the representative of the [appellants] was implicitly understood."

Dorsey argues that this court should not impose an attorney-client relationship in this case merely because Dorsey was familiar with Miller's business model, and it notes that appellants cite no authority to support their argument to the contrary. Dorsey also sets forth several "undisputed material facts that support the lack of a contractual attorney-client relationship": (1) appellants did not ask for representation, and Dorsey never promised it; (2) the lack of direct communication between Dorsey and appellants; (3) the lack of written correspondence from Dorsey to appellants; (4) because Dorsey represented Miller, it

could not have represented appellants in an adverse situation; and (5) Dorsey did not bill appellants, and appellants did not pay Dorsey.

Noting that "a party's mere expectation that an attorney will represent him or her, is insufficient to create an attorney client relationship," the district court explained that appellants' "mere expectation ... that Dorsey represented them" or mere belief that Miller had hired Dorsey for their benefit or that they were Dorsey's clients was insufficient to create an attorney-client relationship between appellants and Dorsey, and concluded that there was no genuine issue of material fact regarding the existence of an express or implied contract for legal services between appellants and Dorsey.

■ We note that it is undisputed that, among other things, appellants did not directly ask Dorsey for legal representation or communicate directly with Dorsey. But we also note that determination of the existence of an implied contract for legal services involves an examination of the communications and circumstances surrounding a transaction. *See Admiral Merchs.,* 494 N.W.2d at 265 (discussing determination of an attorney-client relationship). Here, in addition to the "undisputed material facts" listed earlier, Dorsey points to a deposition statement by a representative of Miller that Dorsey was "retained to represent Miller & Schroeder, and I'll leave it at that." But appellants note that the same representative of Miller confirmed that he "expected that Dorsey's legal work would benefit both Miller & Schroeder and the [appellants]." Appellants also emphasize the fact that Dorsey had been retained by Miller in connection with 36 different gaming loans originated by Miller before the loans to President that are at issue here, and they point to a statement by the Dorsey attorney who

completed most of the work on the President loan documents that she was aware that Miller would be "participating the loans."

We conclude that there are genuine issues of material fact regarding Miller's and Dorsey's understanding of the scope of Dorsey's representation that must be left to the fact-finder rather than be resolved on summary judgment. The district court erred when it determined that no genuine issues of material fact exist regarding whether appellants had an implied contract with Dorsey and when it granted summary judgment to Dorsey on appellants' claim based on that theory.

*Contract–Assignment Theory*

■ Appellants also argue that they had a contractual relationship with Dorsey—and thus have standing to bring a malpractice claim against Dorsey—because they were the assignees of Miller's rights under the terms of the participation agreement. Appellants acknowledge that "Minnesota law currently holds that malpractice claims cannot be assigned" but argue that this court should take its cue from "other courts around the country faced with a commercial transaction where the assignor no longer has [an] interest in pursuing a malpractice claim and the loss is suffered by the assignees." We decline to do so.

In *Wagener v. McDonald*, this court stated, without limitation, that "the assignment of legal malpractice claims is against Minnesota's public policy" for several reasons: (1) it would be incompatible with the attorney's duty of loyalty to the client; (2) it would be incompatible with the attorney's duty to maintain confidentiality; (3) because of the unique character of the attorney-client relationship, it has been "jealously guarded and restricted to only

the parties involved"; (4) there is a risk of collusion against attorneys; and (5) the risk that legal-malpractice actions will be converted into commodities with no regard for the professional relationships or duties traditionally involved, leading to unjustified lawsuits. 509 N.W.2d 188, 191 (Minn. App.1993). Our caselaw is clear on this point. Appellants may not base a legal-malpractice claim on a contract-assignment theory.

*Tort Theory*

■ Appellants argue that they had an attorney-client relationship with Dorsey under the tort theory of representation, which provides that "[a]n attorney-client relationship is created whenever an individual seeks and receives legal advice from an attorney in circumstances in which a reasonable person would rely on such advice." *TJD Dissolution Corp. v. Savoie Supply Co.*, 460 N.W.2d 59, 62 (Minn.App. 1990) (quotation omitted).

The district court noted that under the tort theory of representation, "courts have focused on the contact between the plaintiff and attorney." The district court reasoned that "[e]ven if the facts asserted by the [appellants] reflected some direct contact between the [appellants] and Dorsey, the Participation Agreements specifically disclaimed any responsibility for warranties or representations made in connection with the loan" and concluded that, "as a matter of law, the [appellants'] reliance upon information received from Miller & Schroeder is insufficient to create an attorney-client relationship between the [appellants] and Dorsey."

Although appellants do not dispute Dorsey's contention that there was no direct contact between appellants and Dorsey, appellants assert that direct contact is not required.[2] They also assert that they re-

---

2. Appellants cite an unpublished opinion by this court to argue that no direct contact

lied on Dorsey's advice as it was communicated through Miller and that it was foreseeable to Dorsey that appellants would receive the advice and rely on it because Dorsey knew Miller's business model. Dorsey argues that for the tort theory to apply, a plaintiff must have requested and received legal advice from the defendant attorney and that it is undisputed that appellants did not request or directly receive legal advice from Dorsey.

■ For the tort theory to apply, the plaintiff's reliance on the attorney's advice must have been reasonable. Although reasonableness depends on the circumstances, courts have generally focused on the interactions between the plaintiff and the attorney to determine whether the plaintiff's reliance was reasonable. *See Gramling v. Mem'l Blood Ctrs. of Minn.*, 601 N.W.2d 457, 460 (Minn.App.1999) ("Absent a request for legal advice, we cannot conclude an attorney-client relationship existed under the tort theory of representation."), *review denied* (Minn. Dec. 21, 1999); *see also Langeland v. Farmers State Bank of Trimont*, 319 N.W.2d 26, 31 (Minn.1982) (determining that no attorney-client relationship existed under a tort theory in part because the plaintiffs did not deal directly with the attorney); *Schuler v. Meschke*, 435 N.W.2d 156, 162 (Minn.App.1989) (determining that no attorney-client relationship existed under a tort theory in part because the plaintiffs did not seek legal advice from the attorney), *review denied* (Minn. Apr. 19, 1989).

Because it is undisputed that there was no direct contact between appellants and Dorsey and that appellants did not seek legal advice directly from Dorsey, and because the participation agreement required appellants to affirm that they had made an "independent and informed judgment" regarding the desirability of participating in the loans, which made appellants' reliance on Dorsey's advice unreasonable, we conclude that appellants had no attorney-client relationship with Dorsey under the tort theory of representation and affirm the district court's decision in that respect.

## II. Breach of Contract

■ Appellants contend that the district court erred when it granted summary judgment to Dorsey on appellants' breach-of-contract claim after it concluded that there were no genuine issues of material fact that would allow a determination that a contract existed between appellants and Dorsey. Because we have determined that there are genuine issues of material fact regarding whether appellants had an implied contract for legal services with Dorsey, we also conclude that summary judgment was inappropriately granted on appellants' breach-of-contract claim.

## III. Negligent Misrepresentation

■ Appellants claim that Dorsey "negligently misrepresented the enforceability of the Pledge Agreement," noting a letter that they received from Miller conveying the "sum and substance" of the advice that Miller received from Dorsey. A negligent-misrepresentation claim arising out of legal advice requires the existence of an attorney-client relationship. *Eustis v. David Agency, Inc.*, 417 N.W.2d 295, 298 (Minn.App.1987). Absent an attorney-client relationship, liability arises only if the attorney committed fraud, acted with malice, or otherwise committed an intentional tort. *Id.* The district court concluded that because appellants were

---

between the plaintiff and the attorney is required under the tort theory. Not only is the unpublished opinion not precedential, but also the language for which appellants cite the opinion is dictum.

not clients of Dorsey and because there were no genuine issues of material fact regarding whether Dorsey acted with malice or committed fraud or another intentional tort, summary judgment was appropriate on appellants' negligent-misrepresentation claim.

Appellants argue that because an attorney-client relationship existed, their negligent-misrepresentation claim should be reinstated. Dorsey argues that summary judgment was properly granted on this claim because it is undisputed that Dorsey made no representations whatsoever to appellants, so it could not have negligently misrepresented anything to them.

But under Minnesota caselaw, it is not necessary that Dorsey have made representations directly to appellants. In *Bonhiver v. Graff*, 311 Minn. 111, 122, 248 N.W.2d 291, 298 (1976), the supreme court adopted the formulation of negligent misrepresentation described in the Restatement (Second) of Torts § 552 (1976), which provides:

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) ... [T]he liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information *or knows that the recipient intends to supply it;* and

(b) through reliance upon it in a transaction that he intends the information to influence *or knows that the recipient so intends* or in a substantially similar transaction.

(Emphasis added.)

We concluded earlier that there is a genuine issue of material fact regarding whether an attorney-client relationship existed under a third-party-beneficiary theory or an implied-contract theory, and we also believe that there is a genuine issue of material fact regarding whether Dorsey knew that Miller intended to convey Dorsey's advice to appellants. *See* Restatement (Second) of Torts § 552(2)(a). But appellants' reliance on Dorsey's advice must be "justifiable" to allow recovery for negligent misrepresentation. *Id.* at § 552(1). Whether reliance is justifiable becomes a question of law if there is no evidence supporting a contrary conclusion. *Greuling v. Wells Fargo Home Mortgage, Inc.*, 690 N.W.2d 757, 760 (Minn.App.2005). Because the participation agreement specifically required appellants to affirm that they had made "an independent and informed judgment with respect to the Collateral, Borrower and Obligor and their credit and the desirability of purchasing an undivided interest in the Loan" and to acknowledge that Miller made no warranty or representation regarding the enforceability of any loan documents, appellants' reliance on Dorsey's advice, as communicated through Miller, was not justifiable. Summary judgment was therefore appropriate on appellants' negligent-misrepresentation claim.

## DECISION

We affirm the district court's grant of summary judgment to Dorsey on appellants' negligent-misrepresentation claim. We also affirm the district court's determination that appellants cannot prevail on their legal-malpractice claim under a contract-assignment or a tort theory. But because we conclude that the district court

erred in its application of the law regarding appellants' third-party-beneficiary theory, and because we conclude that there are genuine issues of material fact regarding whether appellants were third-party beneficiaries of Dorsey's representation of Miller and whether appellants had an implied contract for legal services with Dorsey, we reverse and remand for further proceedings consistent with this opinion on appellants' legal-malpractice and breach-of-contract claims. We express no opinion on the merits of any of appellants' claims.

**Affirmed in part, reversed in part, and remanded.**