**McINTOSH COUNTY BANK, et al., Respondents,**

v.

**DORSEY & WHITNEY, LLP, Appellant.**

No. A06–486.

Supreme Court of Minnesota.

March 6, 2008.

Thomas C. Atmore, Edward W. Gale, Leonard, O'Brien, Spencer, Gale & Sayre, Ltd., Minneapolis, for respondent.

Richard G. Mark, Mark G. Schroeder, Jason R. Asmus, Briggs and Morgan, P.A., Minneapolis, for appellant.

Charles E. Lundberg, Bassford Remele, Minneapolis, for amicus curiae Minnesota Lawyers Mutual Insurance Company.

Kay Nord Hunt, Lommen, Abdo, Cole, King & Stageberg, P.A., Minneapolis, for amicus curiae Minnesota State Bar Association and Minnesota Defense Lawyers Association.

## OPINION

MEYER, Justice.

Respondents McIntosh County Bank, et al. (respondents) purchased participation interests in a loan sold to them by Miller & Schroeder (M & S). Appellant law firm Dorsey & Whitney, LLP, (Dorsey) was hired by M & S to assist in structuring, documenting, and securing the loan. After the loan was unpaid, the respondents filed a legal malpractice suit against Dorsey, alleging that the respondents were the third-party beneficiaries of the attorney-client relationship between Dorsey and M & S, because M & S intended Dorsey's services in documenting the loan transaction to benefit the banks that purchased participation interests in the loan. The district court determined that the respondents were neither clients nor third-party beneficiaries, and granted summary judgment to Dorsey. The court of appeals reversed the district court's grant of summary judgment on implied contract and third-party beneficiary theories of standing, holding that the district court failed to apply the appropriate test to determine whether Dorsey owed a duty to the respondents as third-party beneficiaries. We reverse the court of appeals and affirm the district court's grant of summary judgment.

The St. Regis Mohawk Tribe (Tribe) and President R.C.-St. Regis Management Company (President) entered into a Fourth Amended and Restated Management Agreement (Management Agreement) dated November 7, 1997. The Management Agreement required President to pay all development expenses for a casino to be opened on the Tribe's land and to manage the casino once it was built. The Tribe was required to repay the development expenses to President, as well as fees for the management services. The amounts due to President at any particular time were determined with reference to the casino's revenues. Management contracts and collateral agreements between Indian tribes and casino management companies are subject to approval by the National Indian Gaming Commission (NIGC). 25 U.S.C. § 2711(a) (2000); 25 C.F.R. § 533.1 (2007). The Management Agreement received NIGC approval.

M & S agreed in 1998 to obtain financing for President to fund construction and furnishing of the Tribe's casino. M & S negotiated two separate loans (St. Regis loans) to President, the first for $8,624,000 and the second for $3,492,000. The loans were to be secured by President's interest in revenues from the casino. Before closing a loan, M & S typically obtained commitments from banks to purchase participation interests after closing. M & S's business model called for it to sell 100% of

the interest in its loans within one week of closing, and to retain loan servicing. 32 banks (Participants) purchased participation interests in the St. Regis loans. Respondents are 31 of the banks (Bank Participants) and Marshall Investments Corporation, which later entered into subservicing agreements with M & S.[1]

Before signing a Participation Agreement with M & S, each Participant was given a closing book, which included copies of the loan documentation and a template of the Participation Agreement. In the Participation Agreement, M & S was called the "Lender," and the parties defined their relationship as that of "a seller and purchaser of a property interest." The parties agreed that M & S was the "nominal payee" and "nominal secured party," and that it was "to generally act as agent for all the Participants in the holding and disposition of the Collateral." The Participants acknowledged that they purchased their interest "based upon Participant's own independent examination and evaluation of the Loan transaction and the information furnished with respect to Borrower and without any representations or warranties from Lender as to * * * the value and security of the Collateral." The Lender was not to be "responsible for any negligence or misconduct on the part of any * * * attorney, * * * provided that the Lender shall use reasonable care in the selection of such person or firm."

In late 1998, M & S retained Dorsey, the appellant here, to assist in structuring, documenting, and securing the loan. Dorsey had previously handled over thirty loans originated by M & S and was familiar with the business model used by M & S and with the Participation Agreement. M & S and Dorsey did not have a written retainer agreement about the St. Regis representation.

One of the loan documents drafted by Dorsey attorney Paula Rindels (Rindels)

was a Notice and Acknowledgment of Pledge (Pledge Agreement), signed by President, the Tribe, and M & S. The Pledge Agreement's enforceability was critical to securing the St. Regis loans. There was no other guarantee. In this document, the Tribe acknowledged that President had pledged to M & S, as security for the St. Regis loans, the amounts payable by the Tribe to President under the Management Agreement.

The Tribe's signature on the Pledge Agreement was authorized by a Tribal Council Resolution, which conditioned its execution of the Pledge Agreement on inclusion of certain changes to the Management Agreement. One of the changes desired by both President and Tribe was an increased cap on development expenses. A cap increase is a change requiring NIGC approval. The Tribe and President amended the Management Agreement on February 11, 1999, increased the cap, and included the changes in the Pledge Agreement. The amendment to the Management Agreement (Amendment) was submitted to the NIGC for approval. Management contracts or other agreements requiring NIGC approval but not receiving it are void. 25 C.F.R. § 533.7 (2007).

During Dorsey's preparation of loan documentation for the St. Regis loans, a question arose as to whether NIGC approval of the Pledge Agreement was required. Dorsey submitted the Pledge Agreement to the NIGC for a determination on this issue.

On February 16, 1999, the NIGC notified President and the Tribe that it would need additional time to complete its review of the Amendment. President wished to close the St. Regis loans in mid-February, so that the casino's grand opening could occur as planned in April. Dorsey advised M & S that NIGC approval was not required for the Pledge Agreement. There are conflicting facts as to whether Dorsey

---

**1.** The 32nd bank, Bremer Business Finance Corporation, was unsuccessful in pursuing its claims against Dorsey in bankruptcy court.

*See In re SRC Holding Corp.,* 364 B.R. 1, 27, 35 (D.Minn.2007).

informed M & S of the risk involved in closing without obtaining NIGC approval or an NIGC determination that no approval was required. M & S employee Steven Erickson, manager of the Native American financing gaming group, asserts that Dorsey did not advise M & S of the risk of proceeding without an NIGC determination. Rindels asserts that she discussed the risk with at least one M & S representative prior to closing.

M & S had initially advised Participants that it would not close the loans without NIGC approval. When it became clear that NIGC approval could not be obtained in time to close the loans in February, M & S wrote to the Participants, recommending that the St. Regis loans be closed despite lack of NIGC approval, and requesting that the Participants vote on the matter. The Participants voted to close the loans. Rindels was aware that M & S had sent this letter, although no Dorsey attorney drafted the letter and the letter included no reference to Dorsey. Erickson asserted that M & S would not have closed the loans if it had known of the risk of closing without NIGC approval. M & S continued to request proof of NIGC approval after the loans closed.

The Bank Participants were aware that M & S had retained Dorsey. There are conflicting facts regarding whether the purpose of the attorney-client relationship between M & S and Dorsey was to benefit the Bank Participants. Erickson said on one hand that M & S retained Dorsey for the benefit of all the lenders, including the Bank Participants, and on the other that Dorsey was retained to represent only M & S. M & S attorney Mary Jo Brenden consulted with Dorsey attorneys about revisions needed in the Participation Agreement to protect the Participants, but Dorsey did not draft the template Participation Agreement. There were no communications between the Bank Participants and Dorsey regarding the St. Regis loan documentation and closing. Dorsey denied being aware of the identities of the actual Bank Participants prior to their purchase of participation interest in the loan and denies that its work for M & S was intended to directly benefit the Bank Participants.

The St. Regis loans were closed on February 24, 1999. By March 1, 1999, M & S had sold most of the participation interest in the loans. The casino opened in April of 1999. Revenue was well below projections, and by February 2000 President had defaulted on the St. Regis loans.

Dorsey, M & S, and some Participants attempted to negotiate a resolution to the problem of the loan default with President and the Tribe in the fall of 2000. At an October 3 meeting, a Tribe representative expressed the opinion that the Pledge Agreement was unenforceable and void because it had not received NIGC approval.[2]

■ M & S sued President in U.S. District Court for collection of the unpaid loan amounts, and in April 2002 judgment was entered for M & S in the amount of $15,625,528.16. The judgment has not been collected because President has no assets. M & S filed for Chapter 7 bankruptcy relief in January 2002. The Bank Participants and President, in separate actions in New York state courts, attempted to collect from the Tribe, which itself filed a *qui tam* action[3] against President and

2. The NIGC did not determine whether approval of the Pledge Agreement was required, nor did it approve the Pledge Agreement.

3. A *qui tam* action is brought under a statute allowing a private person to sue for a penalty, part of which the government or a public institution will receive. *Black's Law Dictio-*

*nary* 1282 (8th ed.2004). This *qui tam* action was brought under provisions of the Indian Gaming Regulatory Act, including the former 25 U.S.C. § 81 (1958), which provided for a private right of action to void collateral agreements to management agreements not approved by the NIGC.

respondents, seeking a declaration that the Pledge Agreement was void and unenforceable. On April 11, 2005, the respondents, participant Bremer Business Finance Corporation (Bremer), and the Tribe reached a settlement in which the Tribe paid Bremer and the respondents for their interest in the President judgment.

Having exhausted their efforts to collect on the loans against President and the Tribe, the Bank Participants joined with the M & S bankruptcy trustee and Marshall to bring malpractice claims against Dorsey in bankruptcy court. At issue was Dorsey's advice to close the loan without waiting for NIGC approval or an NIGC determination that approval was not required. The bankruptcy court dismissed 28 banks' claims for lack of subject matter jurisdiction, abstained from hearing the remaining participants' claims, and denied Dorsey's motion for summary judgment. Bremer's malpractice action against Dorsey went to trial in bankruptcy court, which recommended a finding that an attorney-client relationship existed between Dorsey and Bremer. *In re SRC Holding Corp.*, 352 B.R. 103, 168–73 (Bankr. D.Minn.2006). On April 6, 2007, the U.S. District Court found on de novo review that Bremer's attorney-client relationship with Dorsey began only in June 2000, and that Bremer was not a third-party beneficiary at the time the loans were closed by M & S in early 1999. *In re SRC Holding Corp.*, 364 B.R. 1, 27, 33–35 (D.Minn.2007).

Respondents brought this malpractice action in Hennepin County District Court, with claims of professional negligence/malpractice on a third-party beneficiary theory, negligent misrepresentation, breach of contract, and breach of fiduciary duty. The breach of fiduciary duty claim was voluntarily dismissed. Dorsey moved for summary judgment on the remaining claims. The district court granted summary judgment on January 17, 2006, concluding (1) that there was no genuine issue of material fact regarding the existence of an express or implied contract for legal services between the respondents and Dorsey; (2) that the respondents' reliance on information received from M & S was insufficient to create an attorney-client relationship with Dorsey under a tort theory; (3) that under the third-party beneficiary theory there was no genuine issue of material fact about whether the respondents were the sole and direct intended beneficiaries of Dorsey's representation of M & S; and (4) that on the negligent misrepresentation claim, in which liability to a nonclient arises only if the attorney has acted with fraud, malice, or committed another intentional tort, no genuine issue of material fact existed about whether Dorsey acted in such a way as to incur liability.

The court of appeals affirmed summary judgment on the negligent misrepresentation claim, on a contract-assignment theory, and on the tort theory of an attorney-client relationship, but reversed on the implied contract and third-party beneficiary theories. *McIntosh County Bank v. Dorsey & Whitney, LLP,* 726 N.W.2d 108, 120–21 (Minn.App.2007). The court of appeals concluded that there were genuine issues of material fact regarding whether the respondents were third-party beneficiaries, and that the district court erred in its application of the law when it did not use the correct test to make that determination. *Id.* at 116. On the implied contract theory, the court of appeals concluded that there were genuine issues of material fact regarding M & S's and Dorsey's understanding of the scope of the representation. *Id.* at 118. Dorsey petitioned for review.

I.

■ On appeal from summary judgment, we review the record to determine

whether there is any genuine issue of material fact, and whether the district court erred in its application of the law. *Nicollet Restoration, Inc. v. City of St. Paul,* 533 N.W.2d 845, 847 (Minn.1995). We must view the evidence in the light most favorable to the nonmoving party. *Id.* We do not weigh the evidence or make factual determinations. *Fairview Hosp. & Health Care Serv. v. St. Paul Fire & Marine Ins. Co.,* 535 N.W.2d 337, 341 (Minn.1995). There is a genuine issue of material fact when the nonmoving party presents evidence that is "sufficiently probative with respect to an essential element of the nonmoving party's case to permit reasonable persons to draw different conclusions." *DLH, Inc. v. Russ,* 566 N.W.2d 60, 71 (Minn.1997). If the material facts are not in dispute, we review the application of the law de novo. *Medica, Inc. v. Atl. Mut. Ins. Co.,* 566 N.W.2d 74, 76 (Minn.1997).

■ The first issue is whether the respondents have standing to sue Dorsey for legal malpractice as a third-party beneficiary of the attorney-client relationship between M & S and Dorsey. The general rule in legal malpractice is that, in the absence of fraud or another improper motive, an attorney is liable for professional negligence only to a person with whom he has an attorney-client relationship. *Marker v. Greenberg,* 313 N.W.2d 4, 5 (Minn. 1981). If an attorney were to owe a duty to a nonclient, it could result in potential ethical conflicts for the attorney and compromise the attorney-client relationship, with its attendant duties of confidentiality, loyalty, and care. In *L & H Airco v. Rapistan Corp.,* we held that absent extraordinary and extreme circumstances involving actual fraud, an attorney may not be held liable in damages to his party-opponent. 446 N.W.2d 372, 380 (Minn. 1989). We stated that such liability "would undermine the attorney's duty to zealously represent the client and resolve all doubts in favor of the client." *Id.* at 379. "It would also undermine the trust between the attorney and client, which is an essential element of the relationship." *Id.*

We have recognized an exception to the general rule of privity in two attorney malpractice cases: *Marker,* 313 N.W.2d at 5, in which we adopted a balancing test from the California case of *Lucas v. Hamm,* 56 Cal.2d 583, 15 Cal.Rptr. 821, 364 P.2d 685, 687 (1961), and *Admiral Merchants Motor Freight, Inc. v. O'Connor & Hannan,* 494 N.W.2d 261, 266 (Minn.1992). Dorsey argues that *Marker* and *Admiral Merchants* establish a threshold requirement that a nonclient be a "direct and intended beneficiary" of the attorney's services; if the nonclient is not the direct and intended beneficiary, the so-called *Lucas* factors are inapplicable. Dorsey asserts that the *Lucas* factors are applied only to determine the extent of the duty owed, not whether a duty is owed in the first instance. The respondents argue that *Marker* adopted the *Lucas* factors as the primary test to determine whether a plaintiff is a third-party beneficiary of an attorney's services, with standing to sue the attorney. The court of appeals agreed with the respondents, concluding that the district court erred when it did not apply the *Lucas* factors to determine whether the respondents had standing to sue. *McIntosh,* 726 N.W.2d at 116. The court of appeals noted that "Minnesota courts have been inconsistent in defining the proper role of the *Lucas* factors." *Id.*[4]

---

4. Our decisions in *Marker* and in *Admiral Merchants* have indeed been interpreted inconsistently. In *Francis v. Piper,* the court of appeals required that the nonclient be an intended beneficiary. 597 N.W.2d 922, 924 (Minn.App.1999). Likewise, in *Holmes v.*

In *Marker*, a father retained an attorney for estate planning services, including a transfer of real estate to the father and son as joint tenants. 313 N.W.2d at 4. The son sued after his father's death, complaining of higher estate taxes occasioned by the choice of a joint tenancy rather than a tenancy-in-common. *Id.* at 4–5. The question in the case was whether the son had standing to sue the attorney for a claim of negligent drafting when the son was never a client of the attorney. *Id.* at 5. We said that "the third party, in order to proceed successfully in a legal malpractice action, must be a direct and intended beneficiary of the lawyer's services." *Id.* (quoting *Brody v. Ruby*, 267 N.W.2d 902, 906 (Iowa 1978)). We noted that other courts had found an exception to the general rule of privity in cases involving drafting or executing a will. *Id.* We ultimately affirmed summary judgment in favor of the attorney, not because the son was not a direct and intended beneficiary of the attorney's services (he clearly was), but because the attorney had not negligently caused the son to suffer a loss. *Id.* at 5–6. To determine the extent of the attorney's duty to the son, we wrote:

> In determining the extent of an attorney's duty to a non-client, courts fre-

quently consider the factors expressed by the *Lucas* court:

> "[T]he determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury, and the policy of preventing future harm."

*Id.* at 5 (quoting *Lucas*, 15 Cal.Rptr. 821, 364 P.2d at 687).[5] We did not explicitly apply every one of the *Lucas* factors in *Marker*, but after considering the client's intent, whether that intent was satisfied by the attorney's work, and whether the harm the son suffered was caused by the attorney's actions, we determined that the attorney owed no duty to the nonclient son because the son had received everything the father intended to give him under the will.[6] *Id.* at 5–6.

Eleven years later, we affirmed the *Marker* rule in *Admiral Merchants*.[7] 494

---

*Winners Entertainment, Inc.,* the court of appeals required that the nonclient be a "direct and intended" beneficiary. 531 N.W.2d 502, 505 (Minn.App.1995) (refusing to extend the exception to a shareholder's claim against the corporation's attorneys). In contrast, the court of appeals in *Goldberger v. Kaplan, Strangis & Kaplan, P.A.* did not articulate a threshold requirement, but concluded that the *Lucas* factors determine whether a nonclient is a third-party beneficiary. 534 N.W.2d 734, 738 (Minn.App.1995).

5. The *Lucas* court applied an additional factor not cited by the *Marker* opinion, namely, "whether the recognition of liability to beneficiaries of wills negligently drawn by attorneys would impose an undue burden on the profession." 15 Cal.Rptr. 821, 364 P.2d at 688.

6. We concluded that the attorney "owed no duty" to the recipient son. 313 N.W.2d at 5. This is an incorrect statement of our conclusion. We denied relief to the son, not because the attorney owed no duty to the son, but rather because the son received what the father intended. The bequest had adverse tax consequences to the son, but we determined that those consequences were not caused by the attorney's negligence—they naturally resulted from the intention of the father as expressed in his will. *Id.* at 6. Our conclusion should have been that the attorney "did not breach the duty owed" to the recipient son.

7. The most recent reference we made to the rule from *Marker* came in a footnote in *Pine Island Farmers Coop. v. Erstad & Riemer, P.A.,* quoting only the "sole purpose" language and

N.W.2d at 266. We said that "an intended third-party beneficiary may bring an action for legal malpractice in those situations when the client's sole purpose is to benefit the third party directly, and the attorney's negligent act caused the beneficiary to suffer a loss." *Id.* (citing *Marker,* 313 N.W.2d at 5). Without detailing our analysis, we concluded that summary judgment was inappropriate under the facts of that case because there remained genuine issues of material fact concerning the existence of an attorney-client relationship under implied contract and tort theories, as well as under the third-party beneficiary exception. *Id.* at 265–66. We did not draw separate conclusions under each of the theories, but simply remanded the case for further proceedings. *Id.* at 266.

▮ We reaffirm the rule of law announced in *Marker* that in order for a third party to proceed in a legal malpractice action, that party must be a direct and intended beneficiary of the attorney's services. To determine the extent of the duty owed to the direct and intended beneficiary of the attorney's services, we will consider the so-called *Lucas* factors. Given the confusion about the meaning of the *Marker* decision, we think it prudent at this time to elaborate further on the meaning of "a direct and intended beneficiary."

▮ We turn first to the meaning of a "direct" beneficiary. A party is a direct beneficiary of a transaction if the transaction has as a central purpose an effect on the third party and the effect is intended as a purpose of the transaction. *See Glanzer v. Shepard,* 233 N.Y. 236, 135 N.E. 275, 275–76 (1922) (concluding that the law imposes potential liability beyond the parties to the contract when the third party is actually at the heart of the contract). In the words of Justice Cardozo, writing for the court in *Glanzer,* the benefit to the third party must be "the end and aim of the transaction" before the beneficiary may be called direct. *Id.* at 275. Requiring that the transaction directly benefit the third party properly serves to prevent nonclients who receive incidental benefits from the representation, or who only receive downstream benefits, from holding the attorney liable.

▮ We turn next to the question of who must be aware of the "intended" beneficiary—the client or the attorney? We described all of the cases we relied on in *Marker* as "situations in which the attorney by his actions produced an instrument that failed to carry out the testamentary intent of the testator." *Marker,* 313 N.W.2d at 5. The testator intended to make a gift to someone, to make someone a beneficiary of his will, and the negligence of the attorney led to that person not receiving the gift. Clearly, the testator-client's intent is crucial. However, the "third-party beneficiary" exception as developed in the will context also implies an attorney's awareness that the client's intent is to make someone a beneficiary of his will.

The California Supreme Court suggested in *Heyer v. Flaig* that an intended beneficiary is a person named in the instrument: "In the case of *Lucas v. Hamm* * * * we embraced the position that an attorney who erred in drafting a will could be held liable to a person named in the instrument who suffered deprivation of benefits as a result of the mistake." 70 Cal.2d 223, 74 Cal.Rptr. 225, 449 P.2d 161, 163 (1969), *superseded by statute on other grounds,* Cal. Civ. Prac.Code § 340.6 (2006), *as recognized in Laird v. Blacker,*

noting that the facts of that case did not implicate the exception. 649 N.W.2d 444, 448 n. 4 (Minn.2002). We have not applied *Marker* since 1992.

2 Cal.4th 606, 7 Cal.Rptr.2d 550, 828 P.2d 691, 700 (1992). *Heyer* further referred to the intended beneficiaries as "persons whose rights and interests are certain and foreseeable." *Id.* at 165. In *Lucas,* the California Supreme Court emphasized that the promisor-attorney must have understood that the promisee-client intended to benefit the third party. 15 Cal.Rptr. 821, 364 P.2d at 689. In these drafting situations, whether the instruments are wills, trust agreements, or deeds, the attorney is necessarily aware of the client's intent when the client asks for documents making gifts or transferring property to particular persons named in the instruments.

We conclude that the attorney must be aware of the client's intent to benefit the third party in order for the exception to be applicable. Such a requirement is in keeping with the fiduciary and ethical duties attorneys owe their clients. Imposing on attorneys a duty toward beneficiaries of whom they are unaware would risk dampening their zealous advocacy on behalf of clients, for fear of harming a third party to whom a duty might later be found to be owed.

 Applying these principles to this case, we conclude that the respondents were not direct and intended beneficiaries of the attorney-client relationship between M & S and Dorsey. This case is far from the will-drafting context in which the third-party beneficiary theory was first developed. Bearing in mind that on this motion for summary judgment we must view the evidence in the light most favorable to the nonmoving party, we conclude that the respondents have not produced evidence that a central purpose of the attorney-client relationship between M & S and Dorsey was to affect the respondents or that the purpose of the transaction was to benefit the respondents. The purpose of the transaction was to close the St. Regis loans. The respondents had no direct communication with Dorsey. They acknowledged in their Participation Agreements that they purchased participations in reliance not on M & S but on their own independent evaluation of the loans. The Bank Participants have shown that Dorsey was aware of M & S's participation model. The depositions and affidavits of Erickson say that M & S expected Dorsey's work to benefit the Bank Participants, but that only M & S was Dorsey's client. Even if M & S did intend Dorsey's work to benefit the purchasers of participations, this would not be enough to impose liability under the test we have clarified above; Dorsey would need to be aware of that intent.

The record does not indicate that Dorsey was aware of that intent. Mary Jo Brenden stated she expected Dorsey would provide advice to benefit both M & S and the Participants, but she points to no conversation in which she expressed that to Dorsey. Although she asked Dorsey for advice in revising the participation agreement, and the changes were for the protection of the Participants, there is no indication that this advice was more than an incidental part of Dorsey's representation. The names of the Bank Participants were not included in any of the instruments Dorsey drafted. No Bank Participant met with Dorsey attorneys prior to or at closing. There was no communication between the Bank Participants and Dorsey before or at closing. The respondents' situation is more analogous to that of the plaintiffs in the California case of *Goodman v. Kennedy,* whose "only relationship to the proposed transaction was that of parties with whom defendant's clients might negotiate a bargain at arm's length." 18 Cal.3d 335, 134 Cal.Rptr. 375, 556 P.2d 737, 743 (1976). The evidence in the record is not sufficiently probative of a third-party beneficiary relationship to allow rea-

sonable persons to draw different conclusions. Because the respondents are not direct and intended beneficiaries, we do not reach the *Lucas* factors. We reverse the court of appeals and affirm the district court's grant of summary judgment on this issue.

## II.

The second issue is whether an implied contract for legal services existed between the Bank Participants and Dorsey. The court of appeals, pointing to Dorsey's awareness that M & S would sell participation interests in the loan, and to Dorsey's familiarity with similar transactions involving M & S, determined that genuine issues of material fact remained regarding Dorsey's and M & S's understanding of the scope of the representation. *McIntosh*, 726 N.W.2d at 117–18.

The contract theory of an attorney-client relationship requires either an express or an implied agreement. *Langeland v. Farmers State Bank of Trimont*, 319 N.W.2d 26, 30 (Minn.1982). The agreement can be "deduced from the circumstances, relationship, and conduct of the parties." *High v. Supreme Lodge of World, Loyal Order of Moose*, 210 Minn. 471, 473, 298 N.W. 723, 725 (1941). Although "it is not expected that the elements of a contract will be as vividly portrayed by the evidence as where an express contract has been pleaded," reliance on an implied contract "does not relieve [a] plaintiff from his burden of establishing all essential contractual ingredients." *Id.* The simple fact that one party benefited from the services of the other does not impose contractual liability. *Id.* at 474–75, 298 N.W. at 725.

The undisputed facts demonstrate that there was no implied agreement between Dorsey and the respondents. There were no communications between the Bank Participants and Dorsey before closing. There was no notice to Dorsey that it was expected to represent the Bank Participants. Indeed, Dorsey was unable to identify the Bank Participants before closing. Viewing the evidence in the light most favorable to the respondents, the only facts supporting a denial of summary judgment regard understandings between M & S and Dorsey. This evidence is not sufficiently probative of an implied contract to allow reasonable persons to draw different conclusions. The simple fact that the respondents would benefit from Dorsey's services does not impose contractual liability. As a matter of law, there was no implied contract for legal services between Dorsey and the respondents, and summary judgment is appropriate.

Reversed.

PAGE, J., took no part in the consideration or decision of this case.

DIETZEN, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.