## MARYLAND TITLE & ESCROW CORPORATION *v.* KOSISKY, ET UX.

[No. 523, September Term, 1965.]

*Decided December 14, 1966.*

Submitted to HAMMOND, C. J., and HORNEY, OPPENHEIMER, BARNES and FINAN, JJ.

Submitted on the brief by *Ronald Willoner* and *Glenn B. Harten* for appellant.

Submitted on the brief by *Kardy, Brannan & Neumann* and *William J. Brannan, Jr.,* for appellees.

HAMMOND, C. J., delivered the opinion of the Court.

Mr. and Mrs. Kosisky on April 24, 1963, contracted to buy a lot, later to be known as 8 Crest Park Court, Silver Spring, on which Rose Construction Company (Rose), the vendor, was to build a house like a model house in the subdivision. The purchase price was $33,990, to come from a first deed of trust of $24,000 and a cash payment of $9,990. The contract expressly was made contingent upon the sale of the residence then owned by the Kosiskys at 10704 Blossom Lane.

The Kosiskys sold their house to a Mr. and Mrs. Hatter and settlement was made on October 25, 1963, at the office of a settlement agent, one Sapero. The Kosiskys were entitled to receive $9,953.88 net of the purchase price, and although they had had no prior connection with Sapero this amount was left with him in escrow to be paid by him to Rose on account of the purchase price of 8 Crest Park Court under an irrevocable assignment to Rose executed by the Kosiskys. On October 28 the Kosiskys attended the settlement of 8 Crest Park Court at the offices of the Maryland Title & Escrow Corporation (Maryland Title), which was insuring the title of the first deed of trust lender, and paid the title company a closing fee. The Kosiskys advised the settlement officer, Beadel, of the assignment to Rose and the settlement sheet (case No. 14508) shows that of the purchase price of $33,990, $18,000 was to come from a first deed of trust, $9,953.88 "By proceeds assigned from Philip Sapero, Atty," and the balance in cash from the Kosiskys. Beadel, one of the three equal owners of the title company, knew that Sapero had worked for another title company and had afterwards "gone into business for himself in Montgomery County." The lender's check for $18,000 was received on November 8 and on November 12 the title company recorded the deed from Rose to the Kosiskys and the deed of trust from the Kosiskys to the lender and paid the purchase price to Rose, although Sapero had not paid over the money in its hands.

The memo calendar of the settlement officer under date of November 14 bears the notation "Call Sapero for money on

case 14508." On November 20, the calendar shows this: "Call Sapero regarding picking up check on case 14508."

Sapero testified that he obtained the financing for the Hatters for their purchase of the Blossom Lane property, that he had not known the Kosiskys, that he could not find a confirming check stub but that he had written a check for $9,953.88 to Maryland Title and signed it (although he knows now they never received it), that at the time he definitely had the funds on hand to pay the check and that his financial difficulties arose later, that a week or two after the settlement at Maryland Title he got a telephone call from Beadel who told him he would send someone over to Sapero's office to pick up the check to which Sapero replied "fine." He recalls thereafter signing the check and telling the girl in his office to give it to the messenger when he arrived. He then forgot about the matter until some time after June 1964 when Beadel called to advise him that the title company had never received the money, and made demand on him for it. The demand was not met and suit was filed against him and the Kosiskys on October 6, 1964.

Beadel testified that in the first half of 1964 he heard or read that Sapero had "gone bad" and said to Edwards, one of the co-owners of the title company, "weren't we lucky to have gotten the approximately ten thousand dollars he owed us on a settlement * * *." Edwards checked and found they had not been lucky. The Maryland Title file shows a letter from Edwards to Sapero under date of July 28, 1964, which says "with further reference to our conversation of today," and then advises Sapero the $9,953.88 has not been disbursed to Maryland Title and requests payment.

The suit of the title company against the Kosiskys and Sapero was on the common counts for monies paid, monies received for the use of the plaintiff and monies found to be due on an account stated and on special counts, which set out the underlying facts and alleged that the Kosiskys had represented that $9,953.88 was in possession of Sapero and would be paid to Maryland Title and that "relying on the representations" Maryland Title paid Rose $9,953.88 and had not been reimbursed, and further alleged that Maryland Title's loss was caused by its "erroneous or mistaken belief" that the money was to

18

be forthcoming from Sapero. The Kosiskys interpleaded the Hatters but Maryland Title did not plead over against them.

The parties duly moved for summary judgments in their respective favors and it was agreed by Maryland Title, the Kosiskys and the Hatters that there was no dispute as to any material fact and that they would submit the case to the court on the motions for summary judgment. Judge Anderson considered the depositions of Beadel and Sapero and the exhibits under Maryland Rule 610 d 1 and decided that the Kosiskys had not expressly or impliedly agreed to repay to Maryland Title any part of the purchase price it paid out and that Maryland Title's loss was brought about by its own negligence and granted judgment in favor of the Kosiskys and the Hatters. He entered judgment against Sapero. Maryland Title appealed but Sapero did not.

The case presents problems of two escrows. There seems to have been an assumption by Judge Anderson and a concensus of the parties on appeal that as far as the Sapero escrow of the net purchase price of the Blossom Lane property is concerned the established rule of law prevails and the Kosiskys had legal title to the monies they assigned to Rose at the time they assigned them and that, this being so, the risk of loss of the monies arising from the default or abscondence of the escrow holder would ordinarily be on them. "If the escrow holder loses or disposes of an escrow, the one having the legal title to it at the time has the risk of loss and a corresponding claim against the escrow holder if the loss is caused by the latter's fault." 1 *Restatement (Second), Agency* § 14D.

> "As between a vendor and purchaser, if property or money deposited by the purchaser is either lost or embezzled by the escrow holder, the loss falls on the one who owned the property or money at the time of its loss or embezzlement. If the escrow holder embezzles the purchase price before the time when, under the terms of the escrow, the vendor is entitled to it, the loss falls on the purchaser; but if the money is embezzled after the time when the vendor has become entitled to it the loss falls on him." 30A C. J. S. *Escrows* § 9, p. 995.

See also Annotation, 39 A. L. R. 1080; *Hildebrand v. Beck* (Cal.), 236 Pac. 301; *Lieb v. Webster* (Wash.), 190 P. 2d 701, 702; *Crum v. City of Los Angeles* (Cal.), 294 Pac. 430, 432; *Majors v. Butler* (Cal.), 221 P. 2d 994, 997. There can be little, if any, doubt that the escrow arrangement with Sapero contemplated that the Kosiskys' deed to the Hatters was to be delivered immediately, that simultaneously the purchase money was to become the property of the Kosiskys and that it was their property when they signed the writing ordering Sapero to pay it to Rose.

The determination that ordinarily the risk of loss of the Sapero escrow would be on the Kosiskys narrows the crucial question to whether the Kosiskys or Maryland Title under the circumstances here present should bear the loss of that escrow money. Subrogation is not specifically mentioned in the pleadings nor, we are told, in the trial briefs, and was not referred to by Judge Anderson in his opinion. This would not preclude the application of the doctrine of subrogation if the pleadings alleged the elements necessary for its application and these elements were supported by the facts so that the doctrine is appropriate and controlling. In *Schnader, Inc. v. Cole Build. Co.,* 236 Md. 17, 23, a somewhat similar action at law by the owner of a subdivision to recover from the former owner, who sold the land to him, a portion of the amount the present owner had been obliged to pay Baltimore County for public improvements as assignee of a public works agreement between the former owner and Baltimore County, the Court said:

> "* * * Cole argues that the doctrine of subrogation was not raised below either in the pleadings or at the trial and that this Court is therefore precluded by Rule 885 from deciding the question of Schnader's right to recover as a subrogee. We think not.
>
> "Although the pleadings did not specifically claim the right of subrogation, we think Schnader was seeking recovery on this theory and that the essential elements necessary for its application were alleged (albeit somewhat ineptly) in the pleadings and established during the course of the trial."

*Schnader* pointed out that subrogation is a doctrine of equity but often is recognized and enforced at law and that this Court had not expressly held subrogation to be cognizable at law but "several previous decisions have recognized the right in cases at law," citing *Packham v. German Fire Ins. Co.,* 91 Md. 515; *Maryland Trust Co. v. Poffenberger,* 156 Md. 200; *Noma Electric Corp. v. Fidelity & Deposit Co.,* 201 Md. 407; and *Orem v. Wrightson,* 51 Md. 34, where subrogation was allowed in the Orphans' Court. Judge Horney, for the Court, then said (at 22 of 236 Md.) :

> "Further, Maryland Rule 243 a (based on a former statute) expressly recognizes the right of a subrogee to seek a judgment at law, the only requirement being that 'the action shall be brought in the name of the real party or parties in interest including those claiming by subrogation.' When, therefore, an action at law is consistent (as this one is) with Rule 243, the right of subrogation should be recognized. See Mullen, *The Equitable Doctrine of Subrogation,* 3 Md. L. Rev. 201, 213. It should, of course, be borne in mind that subrogation is an equitable doctrine and that its operation at law is governed and controlled by the principles of equity."

Legal subrogation (as distinguished from conventional and statutory subrogation) arises by operation of law when there is a debt or obligation owed by one person which another person, who is neither a volunteer nor an intermeddler, pays or discharges under such circumstances as in equity entitled him to reimbursement to prevent unjust enrichment. *Schnader, supra,* at p. 23; Sheldon, *The Law of Subrogation,* § 1; *Restatement, Security* § 141, comment a; *Restatement, Restitution* § 162; 83 C. J. S. *Subrogation* § 3.

The decisive question thus is whether Maryland Title is equitably entitled to reimbursement from the Kosiskys. There is no dispute as to any material facts but those facts permit the drawing of two inferences: the first that Maryland Title recorded the deed and deed of trust and paid Rose, knowing it had not received the $9,953.88 from Sapero but trusting him

to honor his obligation to pay over the monies in his hands under the irrevocable assignment from the Kosiskys to Rose; and the second, that Maryland Title erroneously thought it had Sapero's money in hand when it closed the transfer of 8 Crest Park Court, and found out later that it had not. We think Maryland Title is not equitably entitled to reimbursement from the Kosiskys under either inference.

Maryland Title knew that $9,953.88 was to come from Sapero, evidencing this knowledge and its intent to acquiesce in this source of payment by making the notation to this effect on the settlement sheet. If thereafter on November 12 it paid Rose in reliance on receiving reimbursement from Sapero, as the calendar notations of November 14 and November 20 and Sapero's testimony as to the conversation with Beadel about the messenger picking up the check would indicate, it cannot justly and fairly look to anyone other than Sapero to make it whole. Under those circumstances it relied on Sapero's credit, not on the Kosiskys', and recognized and adopted as its own the agreement, including the irrevocable assignment, between the Kosiskys and Sapero. Its agreement to rely on Sapero modified its right to subrogation against the Kosiskys. It is recognized that one who otherwise would have been entitled to subrogation may have lost that right by agreement or contract.

> "The right of legal subrogation may be modified or extinguished by contract. The doctrine of subrogation cannot be invoked to override and displace the real contract of the parties * * * or where the contract either expressly or by implication forbids its application * * *" 83 C. J. S. *Subrogation,* § 3 b, p. 585-86.

See *Buskirk v. State-Planters' Bank and Trust Co.,* (W. Va.), 169 S. E. 738, where a second mortgagee who had agreed in his mortgage that if he paid real estate taxes they would be added to the amount secured by that mortgage, was held not entitled to be subrogated to a position prior to the first mortgagee as to taxes he had paid.

*Restatement, Restitution* § 162, comment b, says:

> "Where a person discharges an obligation owed by another, or a lien upon the property of another, and

does so officiously, he is not entitled to reimbursement from the other * * *, and is not entitled to be subrogated to the position of the obligee or lien-holder. In such a case it is true that as a result of the payor's act the other is enriched, but the enrichment is not unjust. This is true not only where the person making the payment did so with intention to make a gift to the other, but also where he intended to obtain reimbursement from the other, if payment was officiously made."

Section 2, comment a, defines officiousness to mean "interference in the affairs of others not justified by the circumstances under which the interference takes place." When Maryland Title recorded the deed and deed of trust and paid Rose, its action was not legally officious as to the Kosiskys if it intended to claim reimbursement for its disbursement only against Sapero; it would be legally officious if it intended to claim against the Kosiskys if Sapero did not pay, particularly when by recording the deed of trust it made the Kosiskys become liable for the $18,000 advanced by the lender and made them potentially liable to pay again the $9,953.88 which they had already assigned Rose through Sapero.

If Maryland Title mistakenly thought it had the Sapero money in hand and so negligently paid Rose, it is, we think, in no better position. It is true that a payor ordinarily is not deemed officious where he makes by mistake a payment for which he otherwise would be entitled to reimbursement. *Restatment, Restitution* § 162, comment b. But here Maryland Title, if it did pay by mistake, was negligent not only in making the payment but in failing promptly to effect reimbursement from Sapero. The evidence leaves little doubt that for some months after settlement Sapero had the funds with which to make Maryland Title whole, yet it did not press him until after he had "gone bad" and was unable to pay. Maryland Title has only itself to blame for not healing the harm which came to it from its careless payout, and it would be unjust, now that there can be no recovery from Sapero, to make the Kosiskys stand the loss. The fact that the loss of one who seeks to be made whole by subrogation arose from his own negligence may be fatal to his claim.

Sheldon, *The Law of Subrogation,* § 43. *Cf. Restatement, Restitution* § 59 and § 142. See *Webber v. Frye* (Iowa), 202 N. W. 1, 2, recognizing that "the right of subrogation is lost by inexcusable negligence on the part of the person asserting it," and holding, as one ground of decision, that one who negligently failed to preserve the lien of a mortgage he paid off was prevented by his negligence from being subrogated as a new mortgagee to the priority of the old mortgage over an intervening mechanics' lien.

*Judgments affirmed, with costs.*