**LAWYERS TITLE INSURANCE COR-
PORATION, Appellant,**

v.

**EDMAR CONSTRUCTION COMPANY,
INC., Appellee.**

No. 6105.

District of Columbia Court of Appeals.

Argued March 8, 1972.

Decided Sept. 11, 1972.

Daniel Webster Coon, Washington, D. C., for appellant.

Herman Miller, Washington, D. C., for appellee.

Before GALLAGHER, NEBEKER and YEAGLEY, Associate Judges.

GALLAGHER, Associate Judge:

Plaintiff, Lawyers Title Insurance Corporation (Lawyers Title), brought this suit under the doctrine of subrogation for recovery of $7,900.20 which it paid as the amount due under a promissory note signed by defendant, Edmar Construction Company (Edmar). After a nonjury trial plaintiff was denied recovery and judgment was entered for appellee (defendant) and the third-party plaintiff.[1]

In 1965, Edmar acquired from Paramount Development Corporation (Paramount) for purposes of development, a tract of land divided into 16 lots. As security for a promissory note from Edmar to Paramount in the amount of $112,000 the land was subjected to a first deed of trust. The deed provided that the lien of the instrument could be subordinated to a construction loan to be obtained by Edmar.

In addition, individual lots could be released from obligation under the note upon payment of $7,315.00 for each lot. Subsequently, Edmar obtained a construction loan from Frederick W. Berens Company and the deed of trust in behalf of Paramount was subordinated to a first deed of trust for Berens Company.

In 1966, Edmar sold a house on one of the lots to Richard and Lois Falck at a price of $29,990.00. The Falcks paid cash for the house, obtaining a $13,000 loan from the District Building and Loan Association. This loan was to be secured by a first deed of trust on the property.

At the suggestion of an employee of the real estate broker utilized by Edmar, the Falcks retained the Maryland law firm of Gordon & Meyers as settlement attorney. Acting as the Falcks' settlement attorney, Gordon obtained title insurance running to the mortgagee from Lawyers Title Insurance,[2] this being a prerequisite for the loan by District Building and Loan.

As part of its business practice Lawyers Title had developed a list of "approved attorneys." When a title search was performed by an attorney appearing on this list, Lawyers Title would forego an independent title search in issuing title insurance and instead would rely upon the search made by the "approved attorney." In addition, Lawyers Title had circulated an advertising letter to lenders throughout this area assuring them they would not suffer loss due to work done by "approved attorneys." The list consisted of approximately 100 attorneys, and Gordon was on the list. In procuring title insurance on the Falcks' property Gordon prepared an interim title report prior to settlement and Lawyers Title issued an interim insurance binder to District Building and Loan based largely upon this interim title report.

Within six weeks after settlement on August 19, 1966, Gordon recorded the deed

---

1. The third-party plaintiff was the buyer of the house involved and is not before us on appeal.

2. There is no evidence in the record that Lawyers Title paid Gordon a commission for obtaining the insurance through it.

of conveyance from Edmar and the deed of trust to District Building and Loan, and he satisfied the first deed of trust held by Berens Company prior to settlement. Gordon did not, however, satisfy the note for $7,315.00 held by Paramount despite the presence of over $140,000 in the law firm's escrow account at the time of payment of Berens' first deed of trust.

During the first week of November 1966, Lawyers Title received information that the amount due from Edmar to Paramount was still outstanding, and therefore instituted an independent title investigation of the property. This investigation which Lawyers Title received on December 12th was complete up to December 4th and confirmed that the deed of trust securing the promissory note to Paramount remained in effect and, being prior in time to the deed of trust held by District Building and Loan, it had priority over District's deed of trust.

On December 16th, District Building and Loan demanded that Lawyers Title meet what it termed the obligation of assuring a first deed of trust for it. On December 30, 1966, Lawyers Title issued a final mortgagee policy based upon a final certificate prepared by one of its own employees which in turn was predicated upon the independent investigation of title. At the time the final policy was issued, Lawyers Title was aware of the failure of Gordon to satisfy the amount due under the note.

Later, Lawyers Title made demand upon Edmar to pay the balance due but Edmar refused. Lawyers Title then tendered to Paramount the principal and interest due conditioned upon an assignment of the note to Lawyers Title. Paramount refused this and threatened foreclosure proceedings to provide for payment of the principal amount due plus accrued interest. Ultimately, on February 9, 1967, Lawyers Title

made payment and Lawyers Title then instituted suit for the recovery from Edmar of the $7,900.20 paid in satisfaction of the balance under the note. As the promissory note to Paramount and the contract for sale of the home were executed in Maryland, and the defalcation by Gordon occurred in Maryland, the parties agreed that the law of the State of Maryland was controlling in this case.

■ As between a vendor and vendee, the risk of loss caused by the defalcation of an escrow holder is placed upon the party possessing title to the property involved at the time the defalcation occurs. Zaremba v. Konopka, 94 N.J.Super. 300, 228 A.2d 91 (1967); Van Dyke v. Lauer, 9 Wis.2d 141, 100 N.W.2d 335 (1960); see Annot., 15 A.L.R.2d 870 (1951). Between a vendor and vendee of real property the vendor must bear the loss when the escrow holder absconds after the vendor has become legally entitled to the proceeds of the transaction. Maryland Title & Escrow Corp. v. Kosisky, 245 Md. 13, 225 A.2d 47 (1966). Consequently, had this been a suit between Edmar (vendor) and the Falcks (vendees), the loss caused by Gordon's defalcation would have fallen upon Edmar as it had become the legal titleholder of the proceeds of the sale.

■ This rule does not control here, however, as it is not a suit between buyer and seller. Lawyers Title is proceeding upon the only theory open to it, namely, the principle of subrogation—which is an equitable doctrine employed in accordance with equitable principles. Maryland Title & Escrow Corp. v. Kosisky, *supra*; George L. Schnader, Jr., Inc. v. Cole Bldg. Co., 236 Md. 17, 202 A.2d 326 (1964).[3]

Appellant contends, mainly, that the embezzled funds belonged to Edmar at the time of the loss and appellant as "subrogee of the Falcks and the District Building and

---

3. While subrogation is an equitable doctrine, it has been accepted in Maryland, whose law is controlling in this case, that subrogation is cognizable at law. Maryland Title & Escrow Corp. v. Kosisky, 245 Md. 13, 19–20, 225 A.2d 47, 50 (1966).

Loan Association is, in law and in equity, entitled to recover the funds."[4]

Initially, it should be borne in mind that the title insurance policy involved ran to the mortgagee (District Building and Loan), not the owners (Falcks); and the Report on Title prepared by Gordon and sent to Lawyers Title[5] noted under "objections or defects" the subordinated deed of trust from Edmar to the trustees of Paramount. This Report on Title was affixed by the title company to its Interim Title Binder and sent to District Building and Loan, the lender. At this point, the Report on Title became an integral part of the Interim Binder; and the Binder provided, among other things, that a policy of title insurance would be issued to the lender upon the performance of specified conditions, including the removal of "liens, encumbrances and objections shown in [the] Report on Title."

■ We are met at the start with the question of the source of appellant's claimed right of subrogation. As stated, the title binder did not run to the home buyers but rather to District Building and Loan. Since the binder noted the Paramount lien as an exception, Lawyers Title was relieved on this score until the lien was removed. A title binder is "a binding receipt affording coverage pending the agreed issuance of a policy under which the title company agrees to 'guaranty' the title *subject only to specifically noted and listed 'estates, liens, defects and questions.'*" Caravan Products Co. v. Ritchie, 55 N.J. 71, 75, 259 A.2d 223, 226 (1969) (emphasis added). Since the Paramount lien

was listed as an exception, Lawyers Title had no legal responsibility to District Building and Loan as to this lien under the binder. When Lawyers Title discovered the obligation to Paramount had not been discharged, it entered the picture with its own investigation and, notwithstanding the nonpayment, later issued a final title insurance policy running to District Building and Loan. In pursuing the source of the claimed subrogation, the question arises as to why this was done since there was no legal requirement on Lawyers Title to do so.

The answer to this appears in the testimony of Lawyers Title's representative at the trial. As we stated earlier, Lawyers Title had sent to lenders in this area what was termed an Insured Closing Service letter which stated that if an interim title insurance binder is issued by it before closing instructions are sent to one of its approved attorneys,[6] the lender will be indemnified by the title company for any direct loss or damage to the lender for failure by the approved attorney to comply with the lender's closing instructions. In effect, Lawyers Title offered as a business gesture to indemnify the lender if a defalcation by an approved attorney occurred. After careful questioning by the trial court, the witness affirmed that because of the representations made in the Insured Closing Service letter and since one of its approved attorneys was involved, Lawyers Title considered itself obligated to protect the lien of District Building and Loan; and that, essentially, it was an effort to continue the goodwill of the lender.[7] Consequently, Lawyers Title's right to subro-

---

4. Appellant argues further that Gordon was not an agent of Lawyers Title as the necessary ingredients of agency, for example, control of Gordon by Lawyers Title, were not present. As will be seen, our decision does not rest upon a finding of agency.

5. Actually, it was sent to Central Title Agency, Incorporated, the subsidiary of Lawyers Title which was its agency for Maryland.

6. It will be recalled that Gordon was one of its approved attorneys.

7. The witness at one point said early in his testimony that the title company was obligated either by the Closing Service letter or by the Interim Binder. But upon closer questioning he made no further reference to the binder and, as we have noted, the binder listed the lien in question as an "exception."

gation, realistically, must rest upon their payment of the amount due to Paramount in order to preserve the goodwill of District Building and Loan, with a resultant benefit to Edmar.

Generally speaking, "the essential elements necessary for legal subrogation . . . are: (1) the existence of a debt or obligation for which a party, other than the subrogee, is primarily liable, which (2) the subrogee, who is neither a volunteer nor an intermeddler, pays or discharges in order to protect his own rights and interests." George L. Schnader, Jr., Inc. v. Cole Bldg. Co., *supra*, 202 A.2d at 330. But more specifically, "the question as to whether one is entitled to subrogation, depends on whether the claimant is a mere volunteer and, *if not, whether he is on equitable principles entitled to such subrogation* as against other claimants." Finance Company of America v. Heller, 247 Md. 714, 717, 234 A.2d 611, 612 (1967) (emphasis added).

The right to subrogation depends upon "the circumstances and equities of the particular case." 11 J. Appleman, Insurance Law and Practice § 6502, at 296 (1944). It is normally "enforced only in favor of a superior equity, and it is for the equity court to say who, in good conscience, should bear the loss. . . . Accordingly, subrogation [may] be invoked only where justice [demands] its application and where the equities of the party asking it [are] greater than those of his adversary." *Id.* at 294–95.

The trial court concluded that under the peculiar facts of this case, where (a) the settlement attorney (escrow holder) was an approved attorney of the title company which gave assurances in its Insured Closing Service letter that it would protect lenders from any loss resulting from conduct of these approved attorneys, and (b) the title company loss admittedly followed its determination to "save face" and issue a final title policy to District Building and Loan and pay the loss resulting from the defalcation, the loss should fall on Lawyers Title. While the trial court did not so state in its Memorandum Opinion, it seems implicit that it reached its conclusion after balancing the equities of the parties before it.

Lawyers Title first discovered in early November 1966 that the amount due to Paramount had not been paid by its approved attorney. This was some two and a half months after settlement took place. During November and until December 2nd, there was in the approved attorney's escrow account more than enough to pay the balance due on the Paramount note. Yet the record discloses no effort by Lawyers Title to effectuate payment then by the settlement attorney. Instead, sometime after December 16, 1966, the title company made demand upon Edmar to pay the balance due on the Paramount note.

■■ Beyond this, when Lawyers Title issued its final title insurance policy running to District Building and Loan it well knew the lien had not been removed. It was not then required to insure the title but it did so simply to preserve its goodwill by assuring the lender that its first trust was preserved. This was not a legal obligation of Lawyers Title, nor do we view the act as done under compulsion. We are aware, of course, that the courts recognize a right of subrogation where, for example, a junior lienor discharges a senior lien on the same property in order to preserve his security. 50 Am.Jur. Subrogation § 103 (1944). This is considered to have been done under economic compulsion. We do not view the act of Lawyers Title here as rising to that level.

As between the parties before us, there is no wrongdoer. Edmar did nothing wrong, nor did Lawyers Title. Furthermore, we see no unjust enrichment to be avoided. Edmar's obligation on the amount due under the Paramount note was eventually paid by Lawyers Title instead of by the settlement attorney but we do not

view that as an *unjust* enrichment on the facts of this case.

Viewing all the circumstances, it strikes us that the trial court could reasonably have found that the equities do not balance in appellant's favor. We conclude the judgment should not be disturbed.

Affirmed.