**CREDIT UNION CENTRAL FALLS**

v.

**Lawrence S. GROFF.**

**No. 2006–255–APPEAL.**

Supreme Court of Rhode Island.

March 27, 2009.

Patricia A. Buckley, Esq., Providence, for Plaintiff.

George M. Prescott, Sr., Esq., Lincoln, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice SUTTELL, for the Court.

"All frauds, like the wall daubed with untempered mortar, with which men think to buttress up an edifice, always tend to the decay of what they are devised to support."[1] A closing attorney's misappro-

1. Richard Whately, The New Dictionary of Thoughts: A Cyclopedia of Quotations, origi-

priation of money is the genesis of this appeal. The litigation arises out of the embezzlement of funds entrusted to former attorney Lawrence S. Groff during the course of two real estate closings. The plaintiff, Credit Union Central Falls (CUCF),[2] filed a civil action against Mr. Groff, alleging malpractice/negligence, breach of contract, breach of fiduciary duty, and conversion. The real dispute underlying this appeal, however, concerns the rights of two competing claimants, CUCF and Doris Riendeau, to the funds remaining in Mr. Groff's clients' trust account, funds which now are held in the Registry of the Superior Court. Significantly, pursuant to a Superior Court order entered on December 3, 2004, such funds may not be distributed until all potential claimants have been notified and given an opportunity to establish their entitlement to the funds at a Superior Court hearing. *See Credit Union Central Falls v. Groff,* 871 A.2d 364, 366, 368 (R.I.2005) (*Groff I*).

Ms. Riendeau had been a client of Mr. Groff, and alleged that he had misappropriated her funds in connection with a probate matter. She also filed a civil action and, in April 2006, obtained a judgment of $85,476.41 against Mr. Groff. In *Groff I*, we allowed her to intervene in the instant action in order to protect her interest in the money reposing in Mr. Groff's clients' account. *Groff I*, 871 A.2d at 366–68. She now appeals from the entry of

summary judgment in favor of CUCF. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I

## Facts and Procedural History [3]

Mr. Groff handled real estate loan closings for CUCF for over thirty-five years. Although a borrower could choose his or her own attorney, if the borrower did not have an attorney, CUCF would recommend several, including Mr. Groff. When acting as a closing attorney, Mr. Groff would be responsible for preparing a title report, executing the necessary loan and mortgage documents, recording the mortgage to secure CUCF's priority lien position, disbursing loan proceeds, and providing CUCF with a lender's policy of title insurance. CUCF provided detailed guidance to such closing attorneys in the performance of their duties.[4] In 2003, because of an increased volume of real estate loan refinancings, CUCF changed its closing policy to allow attorneys who were well known to CUCF, including Mr. Groff, to perform closings at their own law offices. To facilitate these transactions, CUCF provided the closing attorney with a check in the attorney's name for the total loan amount with instructions to disburse according to the terms of the agreement between the lender and the borrower.

---

nally compiled by Tryon Edwards, D.D., revised and enlarged by C.N. Catrevas, A.B., Jonathan Edwards, A.M. and Ralph Emerson Browns, A.M., 220 (1966).

2. Credit Union Central Falls is now known as Navigant Credit Union.

3. We derive the facts in our *de novo* review from the affidavits and supporting documents filed by Charles H. White, an attorney and partner in the law firm that is general counsel for CUCF, and Maria F. Braga, the closing administrator at CUCF.

4. CUCF provided a "request for title examination" form with instructions for the attorney to follow. It also provided a "closing instruction sheet" which gave detailed guidance on matters such as payoffs, escrow, closing documents, and savings accounts. The cover sheet for the "request for title examination" required the attorney to attend the closing, submit original title work to CUCF a minimum of forty-eight hours before closing, and obtain payoff figures.

The instant litigation concerns the peculation of the proceeds from two residential mortgage refinancings through CUCF, the first involving Paul and Rebecca Blanchet, and the other, Patrick Corcoran, in which both borrowers selected Mr. Groff as their closing attorney. On January 6, 2004, CUCF disbursed $186,000 in trust to Mr. Groff with instructions that $167,555.66 be used to discharge the Blanchets' two existing mortgages to ensure the priority of the CUCF mortgage. Mr. Groff deposited the entire amount into his clients' trust account and disbursed $15,450.15 to the Blanchets, which represented the difference between the total CUCF loan and the balance of the Blanchets' existing mortgages plus closing costs. Mr. Groff, however, failed to pay off the Blanchets' previous mortgages, and began making monthly payments on the prior loans to conceal their continuing existence.

As required by CUCF, Mr. Groff obtained title insurance for the full amount of the refinancing loan. Mr. Groff purchased a lender's policy of title insurance from Mortgage Guarantee & Title Insurance Company (Mortgage Guarantee) that reflected CUCF's status as first secured mortgagee. The Blanchets noticed sometime after the closing that their previous mortgages still were active and contacted CUCF for clarification. CUCF in turn contacted Mr. Groff who responded in a letter, dated March 10, 2004, that he had applied for and was awaiting receipt of the discharges for the prior mortgages. On March 12, 2004, however, an attorney representing Mr. Groff disclosed to CUCF's general counsel that Mr. Groff had failed to discharge the Blanchets' mortgages and had instead used the money for personal ends.

Upon discovering Mr. Groff's defalcation, CUCF initiated a review of all the loan closings that Mr. Groff handled on CUCF's behalf. It discovered a nearly identical misappropriation that occurred on November 12, 2003, in which Mr. Groff failed to discharge borrower Patrick Corcoran's prior mortgage with funds Mr. Groff had received from CUCF.[5] Mr. Groff also had secured title insurance for this closing through Mortgage Guarantee.

CUCF filed an insurance claim on the Blanchets' policy with Mortgage Guarantee on March 15, 2004, and on the next day it initiated the instant civil action against Mr. Groff. Upon discovering the Corcoran defalcation, CUCF filed a second claim with Mortgage Guarantee on March 18, 2004. On March 31, 2004, Mortgage Guarantee paid a total of $223,410.03 to the Blanchets' and Mr. Corcoran's mortgage holders in fulfillment of its contractual obligations to CUCF. Subsequently, Mortgage Guarantee pursued CUCF's claims against Mr. Groff via subrogation in accordance with the terms of the title insurance policies.[6] CUCF thereafter filed a motion

---

**5.** CUCF disbursed $76,000 to Mr. Groff, $58,000 of which was designated to discharging Mr. Corcoran's prior mortgage with Washington Mutual.

**6.** Section 12(a) of Mortgage Guarantee's Policy of Title Insurance states in pertinent part:

"Whenever the Company shall have settled and paid a claim under this policy, all right of subrogation shall vest in the Company unaffected by any act of the Insured claimant.

"The Company shall be subrogated to and be entitled to all rights and remedies which the Insured claimant would have had against any person or property in respect to the claim had this policy not been issued. If requested by the Company, the Insured claimant shall transfer to the Company all rights and remedies against any person or property necessary in order to perfect this right of subrogation. The Insured claimant shall permit the Company to sue, compromise or settle in the name of the Insured claimant and to use the name of the In-

for summary judgment on all of its claims, which both Mr. Groff and Ms. Riendeau opposed.[7] Ms. Riendeau argued that an issue of material fact existed regarding the scope of Mr. Groff's representation and that she required more discovery to elucidate the relationships between the various parties. Ms. Riendeau also argued that because Mr. Groff was an "agent/approved attorney" for the title insurer, Mortgage Guarantee was vicariously liable to CUCF for Mr. Groff's misdeeds. Therefore, she maintained that Mortgage Guarantee could not also be the subrogee of the lender, and thus was not entitled to recover.

The hearing justice heard arguments on CUCF's summary judgment motion on April 4, 2006. Noting that this Court had not addressed the question of whether a closing attorney represents the lender and/or the mortgagor, the hearing justice was persuaded by a pair of foreign cases, *Flaherty v. Weinberg*, 303 Md. 116, 492 A.2d 618 (1985) and *Kirby v. Chester*, 174 Ga.App. 881, 331 S.E.2d 915 (1985), in which both courts relied upon the third-party beneficiary theory to conclude that a closing attorney owed a duty to a nonclient lender, irrespective of a formal attorney-client relationship. Rather than simply finding that CUCF was an intended bene-

ficiary of Groff's actions, however, the hearing justice also concluded that Groff, in fact, represented both CUCF and the borrowers. Specifically, she stated "I think the defendant dually represented both the plaintiff and the mortgagor. At the very least, the plaintiff was a third party to whom the attorney Groff owed a duty." The hearing justice relied on the affidavits and supporting documents that CUCF had provided the court, and she deemed Mr. Groff's failure to respond to CUCF's requests for admissions as substantive admissions of dual representation under Rule 36 of the Superior Court Rules of Civil Procedure. The hearing justice further noted that Mr. Groff's attorney indicated that he would not be able to present evidence disputing CUCF's allegations. The hearing justice granted CUCF's motion for summary judgment on all claims, except for conversion.[8] Counsel for Ms. Riendeau then sought clarification about whether the court's ruling pertained to her subrogation argument. The hearing justice initially said she would leave the issue open, but after considering it further, she found the subrogation argument to be without merit. An order granting summary judgment was entered on July 26, 2006, and final judgment was

sured claimant in any transaction or litigation involving these rights or remedies."

7. We pause to note a curious anomaly in the pleadings. CUCF's complaint alleged misfeasance by Mr. Groff with respect to only the Blanchet closing. Nevertheless, its motion for summary judgment included the underlying facts of both the Blanchet and Corcoran closings. In his objection to the motion, Mr. Groff also referred to both closings. In her objection, however, Ms. Riendeau stated, "[a]lthough CUCF never amended its complaint to identify this other closing as the Corcoran transaction, and never pleaded additional facts detailing Groff's role in that transaction and his alleged misdeeds, Riendeau will, without waiving her right to raise

this failure to amend and its potential consequences at a later date, assume for purposes of opposing this motion for summary judgment that the transaction mentioned in passing in the complaint is the Corcoran transaction." As final judgment entered in the amount of $223,410.03, a figure that Ms. Riendeau does not dispute, we are satisfied she has waived any objection to CUCF's failure to amend the complaint. *See Bielecki v. Boissel*, 715 A.2d 571, 574 (R.I.1998) (failure to amend did not affect validity of final judgment where adequate evidence presented).

8. CUCF agreed to dismiss this claim to allow final judgment to be entered in the remaining claims.

entered on September 6, 2006, from which Ms. Riendeau timely appealed.

## II

### Standard of Review

This Court reviews a trial justice's decision to grant summary judgment on a *de novo* basis. *United Lending Corp. v. City of Providence*, 827 A.2d 626, 631 (R.I.2003). We will affirm such a decision only if "after reviewing the admissible evidence in the light most favorable to the nonmoving party, we conclude that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law." *Lucier v. Impact Recreation, Ltd.*, 864 A.2d 635, 638 (R.I. 2005) (quoting *DiBattista v. State*, 808 A.2d 1081, 1085 (R.I.2002)). Moreover, the party opposing a summary-judgment motion "has the burden of proving by competent evidence the existence of a disputed issue of material fact and cannot rest upon mere allegations or denials in the pleadings, mere conclusions or mere legal opinions." *Lucier*, 864 A.2d at 638 (quoting *D'Allesandro v. Tarro*, 842 A.2d 1063, 1065 (R.I.2004)).

## III

### Discussion

### A

### Dual Representation

When an attorney abuses his unique position of trust and confidence and misappropriates money entrusted to him as a closing attorney, he sullies not only his own name but also the reputation of a profession that depends on the highest ethical conduct of its members. Real estate closings present a particularly thorny dilemma for the bar because a closing attorney often undertakes responsibilities to various parties to the transaction, in contrast to the typical situation in which each party is zealously represented by counsel. We are mindful of the need to protect clients from the hazards that can accompany multiple representation as well as the need to preserve the public's confidence in the loyalty and integrity of the bar.

Our ethical code does permit multiple representation if there is full disclosure of the terms and risks, the clients consent to dual representation in writing, and the attorney reasonably believes that such representation will not harm either client.[9]

9. Newly amended Article V, Rule 1.7 of the Supreme Court Rules of Professional Conduct provides:

"**Conflict of interest: Current clients.** (a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

"(1) the representation of one client will be directly adverse to another client; or

"(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

"(b) Notwithstanding the existence of a concurrent conflict of interest under para-

graph (a), a lawyer may represent a client if:

"(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

"(2) the representation is not prohibited by law;

"(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

"(4) each affected client gives informed consent, confirmed in writing. (As adopted by the court on February 16, 2007, eff. April 15, 2007.)"

Prior to April 15, 2007, Article V, Rule 1.7 provided as follows:

Neither this Court nor the Rhode Island Supreme Court Ethics Advisory Panel has specifically addressed whether an attorney may properly represent both a lender and a borrower in the same transaction, although the majority of states that have considered the question have permitted the practice. *See* ABA/BNA Lawyers Manual on Professional Conduct 51:324 (2003); *see, e.g.,* Opinions of the Committee on Professional Ethics of the Massachusetts Bar Association, Opinion No. 90–3 (1990) (extolling the cost-saving and other benefits of multiple representation). In addition, the American Bar Association long has sanctioned dual representation of lender and borrower, provided there is full disclosure to both parties.[10] Although the interests of the borrower and lender often align, it is not necessarily true that conflicts will not arise. *See* Philip W. Bolus, *One for All is Worth Two in the Bush: Mixing Metaphors Creates Lawyer Conflict of Interest Problems in Residential Real Estate Transactions,* 56 U. Cin. L. Rev. 639, 644 (1987) (contrasting buyer's interest in "unfettered use of the residence" and keeping closing costs low with lender's interest in assuring adequate se-

cuiity for the mortgage loan); *see also Bank IV Wichita, National Association v. Arn, Mullins, Unruh, Kuhn & Wilson,* 250 Kan. 490, 827 P.2d 758, 768 (1992) (noting "relationship between borrower and lender is usually recognized as * * * adversarial").

 Whether an attorney-client relationship has formed is a question of fact governed by the principles of agency. *Rosati v. Kuzman,* 660 A.2d 263, 265 (R.I. 1995). An agency relationship exists when: (1) the principal manifests that the agent will act for him, (2) the agent accepts the undertaking, and (3) the parties agree that the principal will be in control of the undertaking. *Lawrence v. Anheuser–Busch, Inc.,* 523 A.2d 864, 867 (R.I. 1987); *see also Rosati,* 660 A.2d at 265 ("The essence of an agency relationship is the principal's right to control the work of the agent, whose actions must primarily benefit the principal."). In *Baker v. ICA Mortgage Corp.,* 588 A.2d 616, 617 (R.I. 1991), we said,

> "The act of sending the closing documents and the funds to [the attorney]

"**Conflict of Interest: General Rule.** (a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

"(1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

"(2) each client consents after consultation.

"(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

"(1) the lawyer reasonably believes the representation will not be adversely affected; and

"(2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of

the implications of the common representation and the advantages and risks involved."

10. ABA Informal Ethics Opinion 643 (1963) ("It is certainly conceivable that a conflict of interest can arise between a lending institution and the attorney for the person obtaining the loan. Thus, unless there is a complete disclosure of all the facts and express consent given, an attorney acting as the attorney for the person obtaining the loan who also is an employee of, and attorney for, the lending institution would be acting unethically."); *see also In re Lanza,* 65 N.J. 347, 322 A.2d 445, 448 (1974) ("It is utterly insufficient simply to advise a client that he, the attorney, foresees no conflict of interest and then to ask the client whether the latter will consent to the multiple representation. This is no more than an empty form of words.").

with instructions on closing the loan and disbursing the funds may be interpreted as a manifestation on the part of [the lender] that [the attorney] was to act as its agent. [The attorney's] acceptance may be inferred from the fact that he accepted the documents and attended the closing. The final factor, that the litigants agreed that the principal would control the undertaking, may be shown by [the attorney's] purporting to follow [the lender's] instructions at the closing."

In that case, however, we refrained from finding that an agency relationship existed and vacated the trial court's granting of summary judgment so it could resolve that question of fact. *Id.* at 617–18.

The New Jersey Supreme Court extensively analyzed the relationships between the various parties to a real estate closing in *Sears Mortgage Corp. v. Rose,* 134 N.J. 326, 634 A.2d 74 (1993) and its companion case *Clients' Security Fund of the Bar of New Jersey v. Security Title and Guaranty Co.,* 134 N.J. 358, 634 A.2d 90 (1993). In *Clients' Security Fund,* 634 A.2d at 92–93, a residential condominium owner applied and was approved for a refinancing loan from an institutional lender. He retained the services of a real estate attorney for the closing, and the lender provided the attorney with closing instructions.[11] *Id.* at 93. The lender specifically required that the attorney obtain title insurance and that the prior mortgage be paid off at the closing. *Id.*

At the closing, the attorney executed an "attorney certification," provided to the attorney by the lender, which declared that the lender's mortgage had first priority on the owner's property. *Clients' Security*

*Fund,* 634 A.2d at 93. The attorney never extinguished the original mortgage and absconded with the funds. *Id.* at 94. The New Jersey Supreme Court held that the extensive coordination and control that the lender exercised over the attorney was sufficient to support the trial court's conclusion that the attorney was acting as an agent of the lender for the limited purpose of the closing. *Id.* at 94–95. It relied on its reasoning in *Sears Mortgage Corp.,* 634 A.2d at 82, in which the court held that,

"In almost all cases involving the completion of a real-estate-title closing, the interests of the title insurer are not in conflict with those of the purchaser. As was pointed out by the experts who testified at trial, nothing invidious infects a situation in which the attorney seeks to effectuate the interests of the buyer and the title insurer in completing real-estate closings. Indeed, in most title closings, a third-party lender is involved. Hence, in north Jersey the buyer's attorney often 'wears three hats'— the attorney represents the interests of the buyer, the title insurance company, and the buyer's lender, in effect, serving the interests of three principals. Thus, the possibility of a conflict of interest engenders a duty of full disclosure and disqualification if an actual conflict occurs. It does not, however, preclude the creation of an agency relationship between the attorney and the principals he or she serves."

In the case at bar, there is evidence that CUCF exercised considerable control over the closing. When, as was generally the case, a borrower did not have his own attorney, CUCF recommended one of several attorneys. As one of CUCF's recom-

11. The lender sent the attorney a "closing package," which included the mortgage, note, check jointly payable to the attorney and borrower for the refinancing, and detailed instructions. *Clients' Security Fund of the Bar of New Jersey v. Security Title and Guaranty Co.,* 134 N.J. 358, 634 A.2d 90, 93 (1993).

mended attorneys, Mr. Groff enjoyed a lengthy relationship with CUCF, so much so that he was included among a select group of attorneys that CUCF permitted to conduct closings at the attorney's office. Mr. Groff certainly had a deep financial interest in maintaining a good relationship with CUCF.

Moreover, much of the closing attorney's duties were directly intended to benefit CUCF. CUCF required Mr. Groff to conduct a title examination to ensure that its mortgage would have first priority. Mr. Groff also executed an application for title insurance on behalf of CUCF and as an "agent/approved attorney" of Mortgage Guarantee. Throughout the closing process, CUCF provided extensive guidance to Mr. Groff about how he should conduct the closing. Mr. Groff often communicated directly with CUCF, informing the institution that he had satisfied its various requirements.

We also note, however, that CUCF was careful in its "Title Examination Authorization" document to refer to the closing attorney that the buyers selected as "your attorney" and telling them that the document was "simply authorization to engage the attorney on your behalf." CUCF used the same language in its "Fax Cover Sheet," instructing the closing attorney that he "must attend the closing to represent your client." It also appears that Mr. Groff charged the borrowers for his services, including the title search, survey affidavit, title insurance policy, and recording the mortgage. Finally, Mr. Groff indicated in his correspondence that CUCF had merely referred the matter to him.

 Ms. Riendeau claimed in her opposition to summary judgment that she required more discovery to determine whether an attorney-client relationship existed between CUCF and Mr. Groff. The existence of an attorney-client relationship is a particularly fact-driven inquiry. In the posture of this case we are of the opinion that genuine issues of material fact exist that render inappropriate the grant of summary judgment on the ground that Mr. Groff served as an attorney for both CUCF and the borrowers. Indeed, CUCF, which took pains prior to this controversy to characterize Mr. Groff as the borrowers' attorney, now self-servingly asserts the opposite in making its claims of attorney malpractice, breach of contract, and breach of fiduciary duty. Significantly, it relies on Mr. Groff's refusal to answer CUCF's request that he admit that he "was an attorney employed by the Credit Union" as a substantive admission of an attorney-client relationship. However, Mr. Groff also declined to respond to Ms. Riendeau's request that he admit, "Groff at all times represented the Blanchets, not CUCF, as his clients."

Thus, having come to the murky ethical waters of what is undoubtedly a common practice at real estate closings, we are reluctant to dive in. The record is simply too shallow for our *de novo* review; the factual lacunae too vast for us to affirm the grant of summary judgment on the theory that Mr. Groff represented both CUCF and the borrowers. *Cf. Sears Mortgage Corp.,* 634 A.2d at 79 (noting trial court denied summary judgment to get a "full picture of the relationships" among the various parties involved in the closing). We move on, therefore, and consider the duty and/or responsibility of an attorney to nonclients under these circumstances. Before doing so, however, we caution the bar in regard to the implications of Rule 1.7 and its requirement of full disclosure in the face of potential conflicts of interest.

## B

### Mr. Groff's Duty to CUCF as a Nonclient

 Generally, an attorney owes no duty to an adverse party. *Toste Farm*

*Corp. v. Hadbury, Inc.,* 798 A.2d 901, 907 (R.I.2002). The attorney-client relationship is contractual in nature and "the gravamen of an action for attorney malpractice is 'the negligent breach of [a] contractual duty' * * *." *Church v. McBurney,* 513 A.2d 22, 24 (R.I.1986) (quoting *Flaherty,* 492 A.2d at 627). Fraud is a well-settled exception to the privity requirement that historically bars nonclient recovery for attorney malpractice. *See Nisenzon v. Sadowski,* 689 A.2d 1037, 1046 n. 12 (R.I.1997) (attorney may be liable to nonclients "when his conduct is fraudulent or malicious") (quoting *Likover v. Sunflower Terrace II, Ltd.,* 696 S.W.2d 468, 472 (Tex.Ct.App.1985)); *see also Savings Bank v. Ward,* 100 U.S. 195, 195, 203–04, 25 L.Ed. 621 (1879). Although Mr. Groff's actions strongly suggest fraudulent misrepresentation, CUCF did not allege fraud or deceit in its complaint.

Therefore, for this Court to affirm the hearing justice's grant of summary judgment on the discrete claims of CUCF, we would have to adopt a theory of attorney liability to nonclients novel to this jurisdiction.

The motion justice predicated her finding of attorney liability to a nonclient upon the contractual "third party beneficiary" theory as articulated in *Flaherty v. Weinberg,* 303 Md. 116, 492 A.2d 618 (1985) and *Kirby v. Chester,* 174 Ga.App. 881, 331 S.E.2d 915 (1985). She explained that "[t]he courts adopting this theory require that for a non-client to establish a duty owed by the attorney to the non-client, the latter must allege and prove that the actual intent of the client to benefit the non-client was a direct purpose of the transaction or relationship." The *Flaherty* court recognized the third-party beneficiary theory as an exception to the rule of strict privity that generally adheres in attorney

malpractice cases. *Flaherty,* 492 A.2d at 625. Although characterizing this exception as "peculiarly applicable" to contract actions, the Maryland court analogized the scope of duty concept in negligence actions "to the third party beneficiary concept in the context of attorney malpractice cases." *Id.* Thus, "the test for third party recovery is whether the intent to benefit actually existed, not whether there could have been an intent to benefit the third party." *Id.* The court added:

> "The foregoing suggests that the third party beneficiary exception has a rather narrow scope. Properly applied, this exception will not expose the attorney to endless litigation brought by those who might conceivably derive some indirect benefit from the contractual performance of the attorney and his client. Moreover, this exception should have limited application in adversarial proceedings because our Code of Professional Responsibility requires that a lawyer represent his client zealously within the bounds of the law * * * and that the lawyer ordinarily not represent or act for conflicting interests in a transaction." *Id.* at 625–26; *see also* Art. V, Rules of Professional Conduct, Preamble: A Lawyer's Responsibilities [3]; Art. V, Rule 1.7; *Noble v. Bruce,* [349 Md. 730] 709 A.2d 1264, 1272–73 (Md. 1998) (restating *Flaherty* holding).

In *Kirby,* 331 S.E.2d at 920, the court held that an attorney who produced a title certification for his client's lender owed the lender a duty as a third-party beneficiary. The court noted that the lender specifically required the title certification before it would lend the money and that the purpose of the attorney's certification, therefore, was to "inspire confidence" on the part of the lender. *Id.* at 919. It reasoned that,

"Title certification was expressly directed to [the lender]. It was a declaration intended and tending to inspire confidence. It was given so that [the lender] could trust that [the borrower's] representation that he owned the * * * property was legally correct. By its nature, it sought to invoke reliance on the professional expert opinion rendered and thus to serve as a catalyst for the loan to be made. The client [borrower] did not himself need the assurance; [the lender] did. [The borrower] needed it only so that [the lender] would act to provide [the borrower] with the money he wanted." *Id.*

The court concluded that the attorney owed a duty " 'to use such skill, prudence, and diligence as lawyers of ordinary skill and capacity commonly possess and exercise in the performance of the tasks which they undertake.' " *Id.* at 920. The court explained:

"The initial requirement for establishing liability in a legal malpractice claim is that there be a legal duty. This duty has been held to arise from the attorney-client relationship itself. * * * However, under certain circumstances, professionals owe a duty of reasonable care to parties who are not their clients, i.e., not in privity with them." *Id.* at 918–19.

■ We are of the opinion that the motion justice's reliance on the rationale of *Flaherty* and *Kirby* is sound. This Court has held that the essence "of an action for attorney malpractice is 'the negligent breach of [a] contractual duty' and that in order to maintain such an action, whether brought in tort or in contract, the plaintiff must establish an employment relationship between him/or herself and the attorney." *Church,* 513 A.2d at 24 (quoting *Flaherty,* 492 A.2d at 627). We now recognize that the liability of an attorney may extend to third-party beneficiaries of the attorney-client relationship if it is clear that the contracting parties intended to benefit the third party.[12]

A recent opinion of the Minnesota Supreme Court reaffirmed its rule of law "that in order for a third party to proceed in a legal malpractice action, the party

12. We note that several jurisdictions have embraced a broader foreseeability approach to determine an attorney's duty of care to a nonclient. *See, e.g., Greycas, Inc. v. Proud,* 826 F.2d 1560, 1565 (7th Cir.1987), *cert. denied,* 484 U.S. 1043, 108 S.Ct. 775, 98 L.Ed.2d 862 (1988) (attorney who supplied opinion letter to lender in furtherance of client/borrower's loan application liable for misrepresentations); *Century 21 Deep South Properties, Ltd. v. Corson,* 612 So.2d 359, 374 (Miss.1992) (modifying "the requirements of legal malpractice actions based on an attorney's negligence in performing title work by abolishing the requirement of attorney-client relationship and extending liability to foreseeable third parties who detrimentally rely"); *Petrillo v. Bachenberg,* 139 N.J. 472, 655 A.2d 1354, 1357–60 (1995) (surveying abandonment of privity requirement in favor of liability for attorneys who induce reliance by nonclients); *Chem–Age Industries, Inc. v. Glover,* 652 N.W.2d 756, 770 (S.D.2002) (applying § 51 of the Restatement); *McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests,* 991 S.W.2d 787, 791 (Tex.1999) (discussing liability when attorney invites a nonclient's reliance). Also, the 1 Restatement (Third) of *The Law Governing Lawyers* § 51(2)(a)(b) at 356–57 (2000) recognizes a duty of care to nonclients when the attorney: (1) "invites the nonclient to rely on the lawyer's opinion or provision of other legal services, and the nonclient so relies," and (2) "the nonclient is not, under applicable tort law, too remote from the lawyer to be entitled to protection." *See also* 2 Restatement (Third) of *The Law Governing Lawyers* § 95 Illustration 1 at 21–22 (2000) (specifically discussing attorney's duty of care where borrower client retains attorney to provide an opinion letter to lender verifying good title in order to secure loan for client). Because this theory of liability was neither argued by counsel nor addressed by the hearing justice, we express no opinion on its vitality in this jurisdiction.

must be a direct and intended beneficiary of the attorney's services." *McIntosh County Bank v. Dorsey & Whitney, LLP,* 745 N.W.2d 538, 547 (Minn.2008). The court elaborated that "[a] party is a direct beneficiary of a transaction if the transaction has as a central purpose an effect on the third party and the effect is intended as a purpose of the transaction." *Id.* The court went on to quote Justice Cardozo: "the benefit to the third party must be 'the end and aim of the transaction' before the beneficiary may be called direct." *Id.* (quoting *Glanzer v. Shepard,* 233 N.Y. 236, 135 N.E. 275, 275 (1922)) (concluding that the law imposes potential liability beyond the parties to the contract when the third party is actually at the heart of the contract). The Minnesota court reasoned that "[r]equiring that the transaction directly benefit the third party properly serves to prevent nonclients who receive incidental benefits from the representation, or who only receive downstream benefits, from holding the attorney liable." *Id.* The court also cautioned:

> "that the attorney must be aware of the client's intent to benefit the third party in order for the exception [to the general privity rule in attorney malpractice actions] to be applicable. Such a requirement is in keeping with the fiduciary and ethical duties attorneys owe their clients. Imposing on attorneys a duty toward beneficiaries of whom they are unaware would risk dampening their zealous advocacy on behalf of clients, for fear of harming a third party to whom a duty might later be found to be owed." *Id.* at 548 (viewing lack of direct communication between the purported third-party beneficiary and the attorney as tending to disprove the existence of such a relationship).

Bearing these principles in mind, we apply them to the facts of this case.

The unchallenged facts derived from the affidavits and supporting documentation submitted in this case establish that Mr. Groff represented both the Blanchets and Patrick Corcoran in connection with the closing of their respective refinancing loans with CUCF. To assist his clients in obtaining the loan from CUCF, Mr. Groff was required to ensure that CUCF's mortgage had priority, that all loan documents were properly executed, that the mortgage was recorded, that a title policy was issued in favor of CUCF reflecting its priority position, and that the loan proceeds were properly disbursed. As part of the mortgage application process, both the Blanchets and Mr. Corcoran signed a "title examination authorization" directing CUCF to send the title request to Mr. Groff. The authorization form was clearly written under CUCF letterhead and "strongly" suggested that the borrowers choose their own attorney. It further indicated that upon receipt of the signed form, CUCF would "mail out a request for title to your attorney."

Among the documents that the borrowers signed at the closing were an insurance certificate certifying that they would insure the property against loss by fire under a policy that would include "the standard mortgagee's clause making loss payable to [CUCF] as its interests may appear," and a notice of availability of owner's title insurance advising the borrowers that they were purchasing a mortgagee's policy of title insurance issued to CUCF. Both of these documents were on forms in which CUCF's logo and letterhead clearly appeared.

When reviewing a trial court's grant of a motion for summary judgment, we are required to view the evidence in the light most favorable to the nonmoving party. In this case, Mr. Groff, although he objected to CUCF's motion for summary judg-

ment, proffered no evidence contradicting CUCF's evidentiary submission to support its motion for summary judgment. Ms. Riendeau, as an intervenor, also objected to CUCF's motion for summary judgment. Viewing the evidence in the light most advantageous to Ms. Riendeau, including the statements contained in her request for admissions to Mr. Groff, which we deem to be admitted under Rule 36, we accept the following facts for purposes of summary judgment.

 Both the Blanchets and Mr. Corcoran selected Mr. Groff as their closing attorney, and he at all times represented the borrowers, not CUCF, as his clients. As the closing attorney, Mr. Groff provided certain legal services for the borrowers, such as performing a title search, preparing a title insurance binder, preparing a survey affidavit, and procuring a lender's title insurance policy for CUCF from Mortgage Guarantee, all of which "enabled [the borrowers] to obtain their mortgage refinancing from CUCF and to close the loan." Further, the borrowers paid all legal fees, more specifically from the proceeds of CUCF's mortgage-refinancing loans. Clearly, the borrowers were fully aware of Mr. Groff's efforts because they explicitly authorized Mr. Groff to satisfy CUCF's loan requirements.

We are of the opinion that these facts, together with the uncontested affidavits and supporting documents in the record, lead to the only reasonable conclusion: that the legal services rendered by Mr. Groff on behalf of his borrower-clients were done for the direct purpose of providing CUCF with a first secured mortgage, thereby inducing CUCF to disburse the refinancing loan funds to his clients. *See Kirby,* 331 S.E.2d at 919. Mr. Groff, as an experienced real estate attorney with a long history of closing loans with CUCF, was well aware of his obligation to pay off existing loans from the refinancing proceeds so that CUCF would be placed in a first secured position. During these transactions he had direct and extensive communication with CUCF, and he received explicit closing instructions from CUCF. So too, it cannot be gainsaid that the borrowers intended to provide CUCF with assurances that all preexisting liens had been discharged; otherwise they would not have been able to obtain the loans from the lender. The documents they signed both before and at the closing evince an intent to "inspire confidence" in CUCF by assuring it that the loan was secured by good collateral. *See id.* Accordingly, we are satisfied that CUCF, if not a client, was at the very least an intended beneficiary of the contractual obligations between Mr. Groff and his borrowers, and as such, the attorney owed CUCF a duty of care. Further, it is uncontested that Mr. Groff misappropriated the loan proceeds by not discharging the existing mortgages, thereby impairing CUCF's security. CUCF, therefore, is entitled to recover on its claim of attorney malpractice for Mr. Groff's flagrant breach of his duty to use "ordinary care and skill" in the exercise of his profession. *Holmes v. Peck,* 1 R.I. 242, 245 (1849).

We recognize that a finding of attorney malpractice predicated upon a third-party beneficiary theory will not often be appropriate in summary judgment proceedings. Here, however, because the attorney misfeasance is so blatant and the duty owed to the nonclient so clear, we are satisfied that the limited factual record is sufficient to support summary judgment in CUCF's favor.

## C

### Subrogation

Finally, Ms. Riendeau argues that because Mortgage Guarantee was vicariously

liable to CUCF for the defalcation of Mr. Groff as its agent, it is estopped from pursuing a subrogation claim against Mr. Groff. We disagree with Ms. Riendeau's characterization of Mortgage Guarantee's actions upon discovery of Mr. Groff's failure to pay off the existing mortgages and, therefore, affirm the hearing justice's ruling.

▮▮▮▮ Conventional or contractual subrogation allows the title insurer to "stand in the shoes" of the insured creditor when it pays an obligation in satisfaction of the express terms of their policy. *See Hawkins v. Gadoury*, 713 A.2d 799, 804 (R.I.1998). "[C]onventional subrogation arises by acts of the parties and is founded on some understanding or agreement, express or implied, that takes effect only by an agreement said to be synonymous with assignment." *United States Investment and Development Corp. v. Rhode Island Department of Human Services*, 606 A.2d 1314, 1317 (R.I.1992). "Subrogation requires (1) the existence of a debt or obligation for which a party other than the subrogee is primarily liable, which (2) the subrogee, who is neither a volunteer nor an intermeddler, pays or discharges in order to protect his own rights and interests." *Fidelity National Title Insurance Co. of Pennsylvania v. Chicago Title Insurance Co.*, 64 F.3d 656, 1995 WL 478028 at *2 (4th Cir. Aug. 14, 1995) (citing *Lawyers Title Insurance Corp. v. Edmar Construction Co.*, 294 A.2d 865, 869 (D.C.App. 1972)).

▮▮▮ There is no dispute that Mortgage Guarantee insured CUCF against losses because of "[t]he priority of any lien or encumbrance over the lien of the insured mortgage." Additionally, the title insurance policy explicitly permitted Mortgage Guarantee to purchase the debt to settle a claim under the policy. When Mr. Groff failed to discharge the prior mortgages, Mortgage Guarantee paid the prior mortgages to satisfy its contractual obligation to preserve the priority of CUCF's liens on the properties. CUCF explicitly submitted its claim to Mortgage Guarantee "with regard to [the] above referenced policy." Therefore, Mortgage Guarantee was neither a volunteer nor an intermeddler; it had a contractual obligation to protect CUCF's priority. Once it had done so, according to the subrogation clause, Mortgage Guarantee became entitled to "all rights and remedies which the Insured claimant would have had against any person or property in respect to the claim had this policy not been issued." Having satisfied CUCF's claims, Mortgage Guarantee is entitled to recover whatever money CUCF could have recovered from Mr. Groff had it not been insured by Mortgage Guarantee.

We emphasize, however, that we express no opinion regarding Mortgage Guarantee's right to recover against Mr. Groff vis-à-vis Ms. Riendeau. Those facts were not developed in the summary-judgment proceeding and are not necessary for us to resolve the issues before us. Both Ms. Riendeau and Mortgage Guarantee will have an opportunity to establish their entitlement to the funds now held in the Registry of the Superior Court before those funds are disbursed.

## IV

### Conclusion

For the reasons stated in this opinion, we affirm the judgment of the Superior Court. The record of the case may be remanded to the Superior Court.